Filed 7/2/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RODNEY EUGENE DAVIS, | C084559 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201680002370CUWMGDS) |
| v. | |
| PHYSICIAN ASSISTANT BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Affirmed.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Peter R. Osinoff and Edward Idell for Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Matthew M. Davis, Supervising Deputy Attorney General, and Martin W. Hagan, Deputy Attorney General, for Defendant and Respondent.

Plaintiff Rodney Eugene Davis, a physician assistant, learned to perform liposuction under the guidance of a physician. By his representations, he performed thousands of the procedures. At one point, Davis grew dissatisfied with the physician for whom he worked and their professional arrangement, so he decided to establish a new practice. To do so, Davis needed a physician to serve as his supervising physician. This was required under section 3502 of the Business and Professions Code,[1] part of the Physician Assistant Practice Act (§ 3500.5, the Act), and California Code of Regulations, title 16, section 1399.545. Davis found Dr. Jerrell Borup, who had been an anesthesiologist for 18 years and had not practiced medicine for 12 years. Before meeting Davis, Borup had never performed liposuction or other surgery. Borup agreed to serve as "Medical Director," although he would never perform a procedure at the new practice. Borup's role, in practice, consisted of reviewing charts. Davis, who gave himself the title of "Director of Surgery," would perform all of the liposuction procedures. Davis opened his practice, Pacific Liposculpture, in September 2010.[2]

In 2015, the Physician Assistant Board (the Board)[3] filed an accusation accusing Davis of, among other things, the unlicensed practice of medicine, gross negligence, repeated negligent acts, and false and/or misleading advertising. An administrative law judge (ALJ) found the Board's accusations were established by clear and convincing evidence, and recommended the revocation of Davis's license. The Board adopted the ALJ's findings and recommendations. Davis filed a petition for a writ of administrative

_____

[1] Further undesignated statutory references are to the Business and Professions Code.

[2] The respondent Physician Assistant Board's expert, Dr. Michael Sundine, testified that there is no difference between liposuction and liposculpture, and that liposculpture was "just a marketing term for liposuction." We use the term liposuction, *post*.

[3] The Board operates within the jurisdiction of the Medical Board of California. (§3504.) The Board is authorized to adopt regulations to implement the Act. (§ 3510.)

2

mandamus seeking, inter alia, a writ compelling the Board to set aside its decision. The trial court denied the petition.

On appeal, Davis asserts that the ALJ erred in finding that he committed the various acts alleged, and that the findings are not supported by substantial evidence. He further asserts that the discipline imposed—revocation of his license— constituted a manifest abuse of discretion.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2015, the Board filed its accusation against Davis, accusing him of the unlicensed practice of medicine, gross negligence, repeated negligent acts, false and/or misleading advertising, dishonesty and/or corruption, failure to maintain adequate and accurate medical records, and general unprofessional conduct.

### Evidence Presented by the Board

**Dario Moscoso**

Dario Moscoso met Davis when they both worked at Advanced Lipo where Dr. Kevin Calhoun was the physician owner. Davis performed liposuction procedures at Advanced Lipo every day, Monday through Saturday. Moscoso ran the administrative aspects of the office.

Calhoun never performed any of the liposuction procedures at that office, at least as far as Moscoso observed. Davis told Moscoso that Calhoun "was incapable of doing liposuction procedures. He did not have the knowledge and background and experience to do them. And [Davis] was doing all of the procedures himself, essentially, without Dr. Calhoun's experience and supervision."

Davis expressed unhappiness at working "for someone else that was making all the money." Davis was receiving a commission of 15 percent for each patient he treated. Moscoso testified that Davis felt that arrangement was unfair and was unhappy working under these conditions.

3

Davis and Moscoso decided to start their own company. Moscoso, as chief financial officer, would handle the administrative, accounting, and marketing side of the practice. Davis, as "director of surgery" and chief executive officer, would handle the clinical side. Moscoso and Davis agreed that Davis would receive 70 percent of the income and Moscoso would receive 30 percent. They discussed names for the company and Davis came up with the name Pacific Liposculpture, Inc.

Davis and Moscoso also discussed the need for a medical director. According to Moscoso, Davis "definitely didn't want to have a doctor that was going to be meddling in performing his procedures. He didn't want a doctor involved in the day-to-day procedures. He wanted to work autonomously and someone that would stay away . . . from the office basically." Moscoso posted an advertisement and received seven or eight responses. Dr. Jerrell Borup was selected for an interview because he was retired and he "didn't have any background knowledge or experience with cosmetic surgery. He was not a trained surgeon. And therefore, he would not be involved in the OR with" Davis.

According to Moscoso, at the first interview, Borup told them that he was not interested in performing liposuction. Davis told Borup that "he was performing all the lipo procedures himself and that he didn't need any help in that regard. He didn't need anybody in the OR, and this would be more like a[n] off-site type of supervisory experience." After the interview, Davis "was happy. He said it was perfect. This is what we needed, someone that is not going to be involved with the company, with the day-to-day procedures."

An e-mail referencing a training course for Borup that Davis sent to Moscoso sometime after the first interview read, in pertinent part: "I sent Dr. Borup some info this morning about the course but he didn't reply back. I hope that he will be able to stick with our system once has [*sic*] some knowledge. . . . I'm glad that we're making a contract that will allow for us to make immediate changes in that position if ever needed. We don't want another clumsy physician getting in the way." According to Moscoso, in

4

referring to the "system," Davis was referring to the structure that had been discussed in the interview with Borup, whereby Borup would "stay away . . . from the company and the daily operations."

At a second interview approximately two weeks later, they discussed the "structure" of the arrangement -- "that [Borup] basically could be away from the office and should be away from the office, enjoying his retirement." Davis offered Borup the job of medical director. Moscoso testified that Davis selected Borup over another candidate they interviewed because Borup "did not want to get involved in the day-to-day operations of the company and [the other candidate] wanted to." Initially, everyone agreed Borup would receive 10 percent of the practice's gross revenues. However, before the practice issued its first check to Borup, the percentage was renegotiated to five percent. Davis felt 10 percent was too much to pay Borup "for not doing anything."

Pacific Liposculpture opened for business in September 2010.

Eventually, Davis took the responsibility for marketing away from Moscoso. Davis created Borup's biographical information for the website from Borup's resume, which appeared on the website under the heading, " 'Meet Our Medical Director.' "[4]

_____

[4] A version of the website appearing in the record, archived from February 11, 2011, had a page entitled, "Meet Your Pacific Liposculpture Medical Director." (Bold omitted.) The page read: "Dr. Jerrell Borup is an accomplished board-certified physician with more than 20 years experience. Dr. Borup, along with his highly trained liposculpture team, will help to minimize your risks while offering you the best possible care all under local anesthesia! Because of Dr. Borup's advanced training and expertise in liposuction technology, PacificLipo's procedures significantly reduce pain, swelling and bruising, while providing you with smoother results, tighter skin, permanent improvements, and no unsightly scars. [¶] Formally, he has held the positions of Chief of Staff, Chief of Anesthesia, and Chair of Quality Assessment at Cox Medical Centers. Dr. Borup has also served as President of Ozark Anesthesia Associates in Springfield, Missouri. He is highly published and has extensive experience in his field from his more than 30 years as a United States Naval Captain. [¶] Dr. Borup supervises a team of highly trained liposuctionists with a combined experienced [sic] of well over 10,000 lipo procedures. Members of his team have participated in the liposculpture training of physicians and

Moscoso testified that Davis wanted to downplay the fact that Borup was not a plastic surgeon. Moscoso further testified that, during his employment at Pacific Liposculpture, Borup would come into the office once or twice a month at most, usually once a month.

**Dr. Jerrell Borup**

Dr. Borup testified that he had been a licensed physician in California since 1983. He began his residency in anesthesiology in 1980, and he was board certified in anesthesiology. He published one article, in 1983. As Borup described it, his publication related to "the safety and efficacy of continuous spinal of anesthesia." Borup testified that he had not done a general surgical residency, but "did surgery during [his] internship for a month and a half." This internship took place in 1979 to 1980. When asked what type of surgeries he performed, he testified, "[m]ostly assisted in surgeries and made rounds and changed dressings and all the stuff - - work that interns would do." Asked again what type of surgeries he performed as an intern, Borup testified: "You don't actually do the surgery. You just hold the things for the surgeon to do the same. You're just observing to help him keep things out of his way." Asked again whether he had performed any of the surgeries, Borup responded, "No, no. Just learning."

Borup held various anesthesiology positions between 1982 and 1998. In these positions, he did not perform surgeries, but he did observe many. He testified that he

---

have authored several articles on various subjects from advanced lipo techniques to health and wellness. Share your treatment goals with one of Dr. Borup's specialists so that you will gain the knowledge that one needs to make the most informed decision. [¶] As Medical Director of Pacific Liposculpture, Dr. Borup offers patients a lifetime of experience and knowledge in his state-of-the-art outpatient surgical center." Versions of the web page archived on September 2, 2011, August 19, 2011, and December 19, 2011, contain identical descriptions. Another version, archived on June 23, 2012, differs from this version minimally, stating that Dr. Borup's team had performed a combined total of more than 15,000 procedures, and describing Dr. Borup's "training and expertise in liposuction technology" rather than his "*advanced* training and expertise in liposuction technology . . . ." (Italics added.)

6

performed general anesthesia for "hundreds" of patients during liposuction surgeries between 1984 to 1998.

After practicing as an anesthesiologist for approximately 18 years, Borup suffered a stroke. As a result, he did not practice medicine for 12 years, between 1998 and 2010.

In 2010, Borup joined the American Academy of Anti-Aging Medicine. Asked to describe his experience in the anti-aging field at the time he began at Pacific Liposculpture, Borup testified that he had been "going to meetings." Borup went to Florida for approximately six weeks of training. All of the training was "didactic, not hands-on." At the time of his meeting with Pacific Liposculpture, in August or September 2010, he had "approximately two months' experience in the anti-aging field," whereas, previously, all of his medical experience was in anesthesiology. At the time of this meeting, Borup "was still waiting for [his] hands-on training" with regard to surgeries. As of August 2010, he had not performed any "hands-on surgery." After the meeting, Borup attended a program specifically on liposculpture in September 2010. The program "was about a week of video and didactic. And then at the end -- it was a weekend -- two days of hands-on." Borup performed two procedures during the weekend course under the observation of "a teacher." He did not describe the nature of the procedures he performed, nor the background or training of the "teacher."

Although prior to September 2010, he had not performed any liposuction procedures, Borup did testify that the "flip side of that, actually, is when I was -- the whole time I was an anesthesiologist, I used to put catheters in people's backs and arterial lines and central lines. So the idea of liposculpture is feeling tissue planes and knowing what you're doing. So I had a pretty good feel for that." However, he then acknowledged that he did not perform a single procedure at Pacific Liposculpture. The full extent of Borup's personal surgery experience with liposuction was his two-day training session "and what [he] observed."

Borup testified he originally intended to perform procedures if he obtained a position at Pacific Liposculpture. However, once he saw what Davis did "and how many he'd done," things changed because Borup "could see how good [Davis] was."

Borup started as supervising physician of Pacific Liposculpture on September 20, 2010. He also supervised another physician assistant at another practice who was "doing cosmetic procedures" including Botox and fillers and lasers. He testified that he watched Davis perform "10, 15" procedures, "mostly at first."

Borup testified that the Medical Board investigated him for aiding and abetting the illegal practice of medicine by Davis. At some point, Borup received a notice from the Medical Board that the investigation had been closed, and he notified Davis.[5] Other than the foregoing testimony, the record does not establish the particulars of the investigation or specifically what the Board was investigating.

**Patient L.W.**

Patient L.W. received liposuction from Davis on April 14, 2011. He found Pacific Liposculpture online. When he spoke with an employee at Pacific Liposculpture, L.W. learned that Davis, who was the "director of surgery," would be performing the procedure. L.W. believed at that time that Davis was a doctor, although the employee on the phone did not specifically state that Davis was a doctor. L.W. assumed that a "director of surgery" would be a doctor.

L.W. arrived at Pacific Liposculpture on the day of his procedure, paid his outstanding balance, and was taken into another room. An assistant gave L.W. paperwork to fill out, including an informed consent form. Someone went over the form

---

[5] The letter from the Medical Board read simply: "The Medical Board of California has concluded its review of complaint number 10 2010211037 alleging unprofessional conduct. No further action is anticipated and the complaint file is closed. [¶] Thank you for your cooperation in this matter."

8

with L.W., and he felt he had sufficient time to complete the form. However, Davis did not discuss with L.W. alternative treatments, risk of infection, blood clots, asymmetries, pain, bleeding, poor wound healing, numbness, weight changes, or unhappiness with results, even though entries on the operative summary said he did.

At some point, L.W. said something like, " 'Thanks, Doc,' " and Davis told L.W. that he was not a doctor, that he was "a physician assistant with extreme experience and over 10,000 procedures performed." The revelation "stopped [L.W.] in [his] tracks for a second, but [he] proceeded." He said he proceeded because he was "pretty much . . . a train somewhat in motion already," and he felt comfortable with Davis's friendliness. Additionally, Davis told L.W. that "the facility was run and managed by a supervising doctor," a statement L.W. testified was important to going through with the procedure because Davis was not a doctor.

L.W. lay down on the table and he was given a local anesthetic by injection. Describing the procedure, L.W. testified: "what I recall was that it was very rough and very hurried. And he's kind of a big guy. And I was being moved about a lot and just -- I was in pain. And I was just moaning and groaning. [¶] And at some point I was given more pain medication by injection, and the procedure went on. I -- I'd say it might have been an hour and a half total. It was very grueling. [¶] Afterwards, he pretty much got up and left. He seemed like he was in a hurry. The lady wrapped me in a garment and kind of shooed me out the door, and that was pretty much the end of it. It wasn't quite so warm and fuzzy afterwards." L.W. characterized the entirety of the procedure as "very painful."

**Patient C.N.**

Patient C.N. learned about Pacific Liposculpture from an advertisement and then she visited the website. C.N. remembered seeing on the website that the medical director had "20 years' experience doing it." C.N. testified that, "what led me to call was that there was so many years' experience and that it would . . . be done under local anesthesia.

9

That was one of my concerns, to not be put under; and basically, that he was the chief of staff prior." The website left C.N. with the impression that Dr. Borup was knowledgeable in performing liposculpture.

An employee of Pacific Liposculpture told C.N. on the phone that the "individual who would be performing the surgery had extensive training in this procedure; that . . . the individual was a teacher of this procedure, had actually taught the procedure," although the employee never identified the individual who would be performing the procedure. Based on the website, and the employee's representations, C.N. believed that the person who would be performing the procedure would be the person with 20 years of experience.

In October 2011, C.N. arrived at Pacific Liposculpture and filled out paperwork. Asked if she was given a consent form, C.N. responded: "I was. I think I was. I don't -- I didn't have much time to go over what I was given." She estimated that 10 minutes passed between when she was given the form and when she "went back to have other stuff done." She did not feel she had adequate time to complete the informed consent form. And she did not read the entire document, although she did sign it. No one went over the contents of the form with her.

Someone took C.N. into a back room, weighed her, told her the doctor would be in, and exited the room. Davis then entered the room. C.N. testified that "he introduced himself as the director of surgery." Asked whether she knew at this time that Davis was a physician assistant, C.N. responded that she believed he told her "at that time" that he was "PA or physician assistant," she could not recall which. The fact that Davis indicated he was a physician assistant did not concern C.N. "because [she] thought this guy that had 20 years of training was going to be the one doing [her] surgery." She "was under the impression [Davis] was going to be assisting in the procedure or at least overlooked by Dr. Borup." And by the time she realized the doctor was not going to

10

show up, she "was already getting cut open in the surgery room."  However, she still believed "he would be stepping in."

C.N. was nervous about her tachycardia, and so before going into surgery, she asked Davis about that.[6]  Davis told her she would be fine; he did not ask about any family history of heart problems, and he did not indicate any desire to consult with C.N.'s cardiologist.  Davis spent five minutes with C.N. prior to commencing the procedure.

In the surgery room, Davis gave C.N. injections to numb the site and then made four incisions.  Although C.N. had been told that the procedure would be painless, it was not.  C.N. told Davis that it felt like something was wrong, that she was in pain, and that she "could feel everything he was doing."  Davis told C.N. that he would administer more medication.  C.N. felt pain for the duration of the procedure.  On a scale of one to ten, C.N. characterized the pain she experienced as a nine.  The procedure lasted approximately 45 minutes.  No one else was ever in the surgery room with C.N. and Davis "until the very end."

C.N. called Pacific Liposculpture over the following days to report that she was experiencing a lot of pain, and that "something didn't feel right."  Davis told C.N. that she was fine, that everything would be okay, and that she needed to calm down.  Davis also told C.N. that she was "over-exaggerating."

At no point did Davis tell C.N. he would consult with a supervising physician or medical director.  C.N. never met Dr. Borup.

**Patient K.D.**

Patient K.D. underwent liposuction at Pacific Liposculpture in March 2012.  She had visited the Pacific Liposculpture website and "was very impressed.  I liked that he had 20 years' experience; that he was the chief of staff, chief of anesthesia."  Nothing

---

[6] C.N. did not note this condition on the form she filled out which included a field for ongoing medical problems.

11

about the website suggested to K.D. that anyone other than a doctor would perform the procedure. Similarly, in the telephone conversations she had with an employee at Pacific Liposculpture, K.D. was not told anything that would make her believe that anyone other than a doctor would perform the procedure.

When K.D. arrived at Pacific Liposculpture, she was given papers to fill out including an informed consent form. She had less than five minutes to complete the form, which she did not think was enough.

K.D. was then taken into another room and instructed to remove her clothes, put on a gown, and wait. No one had explained to her by this point what the procedure would involve, the nature of the risks involved, or who would perform the procedure.

Davis came into the operating room, introduced himself by name, and told K.D. that he was going to give her a local anesthetic and begin the procedure. Davis did not state what his title was, and, at this point, K.D. believed that he was a doctor. Contrary to entries on the operative summary, Davis did not discuss with K.D. anything about blood clots, bleeding, infection, or any of the other risks mentioned in the summary.

K.D. experienced pain during the procedure. When Davis began working near where K.D. had scar tissue from a previous surgery, it hurt "a lot." K.D. told Davis, and he replied by saying he would administer more anesthetic, which he did "many times."

K.D. went back for a second procedure the following day. She still had no reason to believe that Davis was not a doctor. Once again, Davis did not discuss the potential risks and complications that appear on the operative summary.

K.D. was again taken into the operating room, Davis came in, and he started K.D.'s second procedure. K.D. experienced pain during the second procedure.

No one was present during either procedure other than K.D. and Davis. K.D. did not see a doctor during either procedure. Asked if she knew whether someone was supposed to supervise Davis's work, K.D. responded, "I thought he was the doctor."

12

K.D. acknowledged that no one told her that Davis was a doctor, but she also testified that, at the relevant times, she thought Davis was Dr. Borup.

After K.D. went home following the second procedure, she contacted Pacific Liposculpture because she was experiencing pain which she characterized as an "eight or a nine." When K.D. notified Davis of the pain she was experiencing, he called her a "drug seeker." Davis told K.D. that "none of his other patients had any kind of pain afterwards and that he did not believe" her. Davis told K.D. to go see her doctor; he did not tell K.D. he had a supervising physician or suggest a consultation with that physician. K.D. discovered that Davis was not a physician approximately one month after her procedures. Asked whether or not she would have gone through with either procedures had she known Davis was not a doctor, K.D. answered, "Absolutely not." When asked why not, she stated, "Because he's not a doctor and he's not a surgeon."

**Patient S.M.**

Patient S.M. had liposuction at Pacific Liposculpture in April 2013. S.M. was familiar with Pacific Liposculpture because she was seeing an aesthetician who rented space in the same office. She was also familiar with Davis, having seen him around the office. On at least one occasion, S.M. heard "girls in the office" refer to Davis as "Dr. Rod." S.M. believed Davis was a doctor. S.M. researched Pacific Liposculpture on the website as well as on Facebook and Yelp. S.M. saw at least one reference to "Dr. Rod" on Yelp or Facebook.

Davis performed the procedure on S.M. on April 17, 2013. Upon her arrival at the office, S.M. was given the informed consent form. S.M. had about 10 minutes to review the form, which she did not feel was sufficient. S.M. signed the form even though she did not read it through.

S.M. testified that at the time of the procedure, she knew Davis's title was "director of surgery," but she did not know whether he was a doctor, a physician

13

assistant, or something else.[7] S.M. did not believe Davis discussed with her any of the risks that are described on the informed consent form or the risks listed on the procedure note.

Davis administered a medication in pill form, and then he began to numb S.M.'s thighs. As S.M. recalled, the numbing process hurt more than the actual procedure. She did not recall experiencing pain during the procedure. S.M. never met Dr. Borup.

Approximately five weeks after the procedure, a sack of fluid formed on S.M.'s right thigh. S.M. discussed the development with Davis at a follow-up appointment. Davis told S.M. that the condition was normal, and that she had nothing to worry about. He told her that it would go away. He did not offer S.M. the option of seeing a supervising physician or the medical director. As time passed, the swelling did not dissipate and it grew harder. S.M. contacted Davis again the following month and sent him photographs. Davis called in a prescription to S.M.'s pharmacy, and she took the medication. Thereafter, S.M. communicated to Davis that the swelling had not diminished and that it was "very hard." Additionally, a bruise had formed at the site of the swelling. S.M. grew concerned that she might have a seroma that could require

---

[7] According to a report completed by an investigator working on behalf of the State of California Department of Consumer Affairs, Division of Investigation, Health Quality Investigation Unit, S.M. said she knew Davis was a physician assistant, not a doctor, from reviewing Pacific Liposculpture's website. According to this report, S.M. had said she was confident in Davis's ability to perform the procedure even though she knew he was not a doctor. In her testimony before the ALJ, S.M. testified that she did not tell the investigator that she knew Davis was a physician assistant. S.M. testified that she read the investigator's summary, and "there were some other things in there that were not exactly correct; that I'm not sure if he misunderstood what I said or -- but when I read through his -- his report, I was like, 'Oh, that's -- that's not right, or he got that a little wrong as well.' [¶] So there are some discrepancies other than what you're saying in that report." The ALJ noted these discrepancies in her decision. We also note that before S.M. spoke to the investigator, she told Dr. Munish Batra, a plastic surgeon with whom she consulted, that she thought Davis was a doctor and referred to Davis as Doctor Rod Davis. We summarize Dr. Batra's testimony and report, *post*.

14

additional surgery if it was not drained.  She again contacted Davis.  Again, Davis did not offer to have her seen by a supervising physician or medical director.

S.M. went to her primary care physician, who had an ultrasound performed and then referred S.M. to Dr. Munish Batra.  S.M. testified that Dr. Batra diagnosed the condition on her right thigh as a pseudobursa.[8]  Dr. Batra informed S.M. that surgery was required to remove the pseudobursa, and that it would leave a scar and possibly an indentation.  S.M. also had Dr. Batra look at her left thigh.  Dr. Batra told S.M. that her "left thigh had been over-suctioned, and it was going to require a . . . fat transfer or fat graft or something like that to fix that."

S.M. testified that Dr. Batra asked who performed the liposuction procedure, and she responded that "Dr. Rod Davis" performed the procedure.  Dr. Batra had not heard of him.  S.M. and Dr. Batra looked at Pacific Liposculpture's website, and Dr. Batra said, " 'Oh, my god.  You had a physician assistant do your liposuction,' " and explained that a physician assistant is not a doctor.  As of the time of her testimony, S.M. had not had the cosmetic repairs performed because she could not afford to pay for the procedure.

S.M. testified that she found Davis's title—"director of surgery"—to be "extremely misleading."  S.M. did not realize that, in California, someone could have that title when the person is not even a surgeon.  She explained, "To me, any initials after his

---

[8]  Davis's expert described a pseudobursa:  "So when you do a procedure like liposuction, one of the risks is a development of a fluid collection that is called a seroma, which is the protein in blood can leak out through the tissues and cause a localized fluid collection called a seroma -- serum.  [¶]  And if that seroma is drained and it keeps coming back and back and back, what happens is a tissue on the inside that's making the fluid forms a shiny capsule, which is a mature kind of immunologic response; that once it forms, it no longer responds to simple aspirations and compression or steroids so that once you get a bursal or what we call a pseudobursal cavity, then the only way to treat the fluid that's being made as a result of a pseudobursal cavity is to actually operate and remove the capsule within the cavity."

15

name -- PA, I didn't know what that meant.  But director of surgery sounds like somebody who's a doctor and somebody who's performing surgeries on people."

**Dr. Munish Batra**

Dr. Batra is board certified in plastic surgery and reconstructive surgery.  He testified that "[m]ost of [his] practice is esthetic surgery, breast and body work."  Although he did not testify at Davis's hearing, Dr. Batra gave a deposition and wrote a report, both of which were received into evidence.  It was his complaint that started the investigation underlying the instant allegations against Davis.

Dr. Batra examined S.M. on September 11, 2013.  In his report, under the heading "Physical Examination," he wrote:  "Examination today reveals the patient has *obvious* pseudobursal cyst on the leg.  The patient was told that this would require an excision with a resulting scar."  (Capitalization and bold omitted, italics added.)  He testified that the pseudobursae had been "completely misdiagnosed" by Davis.

Regarding S.M.'s pseudobursae, Dr. Batra testified, "it looks like hell."  He explained, "you can get a pseudobursae even in cases where liposuction's done appropriately.  But you should be able to recognize that this is a pseudobursae and treat it."  He further explained, a pseudobursae "should be treated right away" and if it is not, surgery is required.  The cost for surgery would have been $11,500, but S.M.'s insurance did not cover it.

Dr. Batra testified that when he first saw S.M., she said she thought Davis was a doctor and knew him as Doctor Rod.  Because Batra had not heard of a Dr. Davis, he and S.M. looked him up on the Internet and noted that the website said Davis was a physician assistant, not a physician.  Thereafter, he called Pacific Liposculpture, spoke briefly with Davis, and told Davis to have his supervisor contact him.  Borup returned the call and Batra admonished him about letting a physician assistant do liposuction procedures "[u]nless you have a plastic surgeon who is experienced in liposuction . . . ."

16

**The Board's Expert — Dr. Michael Sundine**

Dr. Michael Sundine, who had been practicing medicine since 1987, testified as the Board's expert.

Sundine opined that, as a physician assistant, Davis was not competent or qualified to perform liposuction surgery. During the course of his plastic surgery residency, Sundine never learned of a situation where a physician assistant performed liposuction surgery without supervision. He testified that Davis violated the applicable standard of care during the relevant time periods by performing liposuction surgery.

Sundine's opinion was that someone performing liposuction surgery should be, at a minimum, "either an MD or a doctor of osteopathy," and should be board certified in one of the recognized surgical specialties.[9] Measured against this standard, Sundine opined that Davis's qualifications were lacking because he was not an MD or a doctor of osteopathy, he had not been board certified, and he had been trained by a radiologist. Sundine opined that Davis lacked the education, training, and experience to perform liposuction surgery. Further, Sundine opined that Dr. Borup did not meet the minimum qualifications for performing liposuction surgery and that Pacific Liposculpture "was set up so that [Davis] absolutely did function autonomously." Sundine believed that, in performing liposuction surgeries, Davis engaged in the unlicensed practice of medicine.

Sundine testified that it was his opinion that Davis violated the applicable standard of care by using the title "director of surgery." Asked whether it was standard in the medical community for a physician assistant to identify as a director of surgery or chief of surgery, Sundine testified: "I've never heard any of it at any of the hospitals that I've been at." Sundine testified that a director of surgery should be, at the least, a medical

---

[9] Dr. Sundine further explained that plastic surgeons are trained in liposuction, but "[i]f you're not a plastic surgeon, then there are alternative pathways that people can do that, such as taking extended courses, along with cadaveric kind of experiences."

17

doctor and typically skilled in the field of surgery.  He opined it was misleading for a physician assistant to identify as a director of surgery because "it tries to bestow credentials that I don't think they will have."  A physician assistant using that title implies he or she has more experience and education than he or she actually has.

Sundine testified that Davis also violated the applicable standard of care regarding "appropriate and adequate informed consent" in his use of the informed consent forms. One version of the informed consent form used by Pacific Liposculpture stated:  "I hereby authorize Dr. Jerrell Borup, MD, Rod Davis, PA, and such assistants as may be selected to perform the procedure or treatment."  Sundine testified that, on the forms, "there's this kind of hint that Dr. Borup . . . really is the person who's doing it or supervising it or is directly there.  I think it's very misleading."  Describing another way in which he believed Davis violated the duty of care regarding informed consent, Sundine testified:  "informed consent's a process, and it's a process that takes a long time.  You know, it really includes a really thorough discussion of the risks and complications of the procedures.  [¶]  And from reading some of the complaints, it's -- it seems like these patients was [*sic*] asked to sign a form and whisked back to surgery.  And it doesn't seem -- and I believe that they actually said that they really didn't have a lot of time prior to the procedure, the surgery.  [¶]  And in that regard, I think that probably that the informed consent process wasn't adequate."  Sundine opined that the applicable standard of care regarding informed consent required the practitioner to actually discuss the matters with the patient.

Sundine reviewed the case file of a patient who developed a seroma.[10]  Sundine opined that Davis's initial management of the seroma was appropriate.[11]  However, Sundine further opined that "the later management -- I think he needed to be more aggressive about trying to deal with that."  He testified that, beyond "a couple weeks . . . you want to start thinking that you might need to do something else."  Sundine further opined that, when more aggressive management was called for, a physician assistant should bring the matter to the attention of a supervising physician.  It did not appear that Davis did so, and Sundine believed that this failure violated the applicable standard of care.  In his report, Sundine noted that a seroma is a potential complication of liposuction, and is listed in Davis's informed consent document.  Sundine stated that it was "amazing" that Davis "did not recognize the seroma which could have been easily diagnosed with an ultrasound or something as simple as a needle aspiration."  Sundine further stated:  "By failing to treat the seroma early the patient will now require excision of the pseudo-bursa as proposed by Dr. Batra and will also likely need fat transfer to the right medial thigh as well."  Sundine characterized Davis's performance as an "[e]xtreme departure."

**Evidence Presented by Davis**

**Davis's Testimony**

Davis testified that he attended a physical therapy graduate program at Touro College on Long Island.  He was in the master's program for one year, and then transferred to the physician assistant program, upon completion of which he received

---

[10]  At this point in Sundine's testimony, he did not specifically identify S.M. as the patient being discussed.  However, it is clear from his testimony that he is referring to his review of S.M.'s file.  Davis does not contend otherwise.

[11]  Dr. Borup also testified that he did not disagree with Davis's initial treatment of S.M., characterizing it as "conservative care."  He testified that seromas usually spontaneously resolve when the fluid reabsorbs.

"another bachelor of science degree." After obtaining his degree, Davis in 2002 took a board certification exam, after which he worked in an orthopedic surgery clinic in Brooklyn. While working there, Davis was also "moonlighting" at the emergency room at Good Samaritan Hospital. After about a year, Davis began working with another orthopedic surgeon group. He continued to work in the emergency room as well for another two years. With the new orthopedic group, Davis worked in the operating room assisting with surgeries.

In 2007, Davis relocated to Beverly Hills to begin training with Dr. Craig Bittner. He applied for his California physician assistant license as soon as he was offered the job. After arriving in California, Davis learned that the Board rejected his license application "due to not being truthful on their application . . . ." Davis testified that the issue related to a question on the application asking if the applicant had ever been convicted of any crime. Davis had answered no. He learned from the Board that "something came up from 1992" on his background check, something he failed to disclose on the application, an omission the Board found to be dishonest. He testified that the issue related to an incident when he was 18 and working at a gas station in New Jersey, and he and a friend "started skimming money for beer," eventually taking approximately $100 by the time he was caught. He further testified he did not realize he had suffered a conviction; he thought he just had to sign a form and "it would be as if it never happened." Davis called the procedure a "pretrial intervention program" or "PTI." He also may have had to pay a fine. Davis communicated with the Board and was offered the choice of a probationary license or appealing the Board's decision, which could take a year. Davis accepted the probationary license, with a three-year probationary term.

Once Davis's license was in place, Dr. Bittner became his supervising physician. On cross-examination, Davis acknowledged that Bittner was not a plastic surgeon, but rather was an "interventional radiologist" "trained to do minor surgical procedures . . . ." He learned how to do liposuction from Dr. Bittner, working at Bittner's office from

20

October 2007 to September 2008.  Davis estimated he performed "several thousand" procedures while he was employed there.

Eventually, Davis decided to look for another job performing liposuction.  He began working for Dr. Calhoun in April 2009, and performed liposuction procedures by himself out of both of Calhoun's San Diego offices.  He estimated that he saw three or four patients each day.

Moscoso was the office manager at Calhoun's office.  Davis and Moscoso complained to each other about Calhoun.  At some point, one of Davis's paychecks bounced, and Davis had a heated discussion with Calhoun.  After that, Moscoso, who had witnessed the argument, pulled Davis aside and told him that Davis was the one doing all the work and that there were other physicians who would be happy to have Davis.  Moscoso asked Davis if he wanted him to look into the possibility, and Davis agreed.  Davis left Calhoun's office in August 2010.

Davis and Moscoso decided to establish a management services organization (MSO).  Eventually, Pacific Liposculpture in La Jolla was up and running.  Davis testified that the structure included three organizations:  "There was the medical practice, which Dr. Borup was 100 percent shareholder of.  There was the [MSO], which [Moscoso] and [Davis] were shareholders of.  And then there was basically [Davis] as an independent contractor who was being -- I don't know if hired is the right word -- but hired by Dr. Borup's medical practice to perform its medical procedures."  According to Davis, the purpose of the MSO was the "management of all things not lipo."[12]  Davis further described the MSO:  "Everything that a physician would need to come into an office on a turnkey basis without having to worry about those things himself is the

---

[12] Eventually, following "a big blowup fight," Davis and Moscoso realized they could no longer work together.  They each found attorneys and proceeded with a buyout negotiation.

21

function of the MSO." Davis testified that, in setting up Pacific Liposculpture, he consulted the *California Physician's Assistant's and Supervising Physician's Handbook*, authored by attorney Michael Scarano, who had been General Counsel to the California Academy of Physician Assistants.[13]

Davis and Borup entered into a delegation of services agreement, which included certain protocols and by which Borup authorized Davis to perform specified services, including the administration of local anesthesia and sedation and liposuction procedures.[14] Dr. Borup was approved as Davis's supervising physician by Davis's probation monitor, which we discuss in greater detail *post*.

Davis testified on cross-examination that Borup's "specialty" was liposuction surgery, although Davis conceded it "was a new specialty for him . . . ." The relevant training and experience on which Davis relied in concluding that liposuction surgery was Borup's specialty consisted of the weekend course Borup took and having performed two procedures as part of the course.

Asked if he wanted Dr. Borup to be involved in performing liposuction on patients, Davis responded: "I preferred to be the primary provider of lipo." When he was

---

[13] We set forth passages from the handbook Davis relied upon, *post*.

[14] At all times relevant here, section 3501 defined a "delegation of services agreement" as follows: " 'Delegation of services agreement' means the writing that delegates to a physician assistant from a supervising physician the medical services the physician assistant is authorized to perform consistent with subdivision (a) of Section 1399.540 of Title 16 of the California Code of Regulations." However, that section was recently amended and now provides: " 'Practice agreement' means the writing, developed through collaboration among one or more physicians and surgeons and one or more physician assistants, that defines the medical services the physician assistant is authorized to perform pursuant to Section 3502 and that grants approval for physicians and surgeons on the staff of an organized health care system to supervise one or more physician assistants in the organized health care system. Any reference to a delegation of services agreement relating to physician assistants in any other law shall have the same meaning as a practice agreement." (§ 3501, subd. (k), as amended by Stats. 2019, ch. 707, § 2.)

asked if he made this clear to Borup, Davis replied: "We had a couple of discussions about it. And the way that I phrased it was, 'I want to get things off the ground. Let me get this going, of course, under your supervision. But I know that we need to have good photos on the website. We need to have good reviews.' " As the practice got underway, Davis wanted to " 'get some good results.' " Davis felt very confident that he could do it. He testified that there was "always this promise floating in the air that one day after [he] got some of these procedures under our belts and we had a good reputation going that we would then start to do more stuff together." However, Davis noted that patients would be coming to the practice having seen photographs of results achieved by him, not Dr. Borup. Therefore, "it seemed more straightforward to just have the person whose work is displayed on the site" perform the procedures. He explained: "I think we can avoid more problems by making sure we stayed consistent with that versus having Dr. Borup . . . practicing on people just for the sake of practicing and maybe ending up with some 19-year-old woman who's very upset with some results because she looked at photos and thought that she was going to get something similar to what was in the photos rather than a doctor who was . . . just practicing just to practice." Davis was concerned that Borup was not as skilled when it came to the artistic aspect of the liposuction procedures. "He could do a procedure safely. . . . But making sure that everything looked smooth and the patient's happy, that's -- I thought I would be better at that part." Davis testified on cross-examination that he knew he could do a better job and achieve nicer-looking results than Borup. And he admitted that he did not want Borup performing any procedures.

With regard to his informed consent forms, Davis testified that he essentially just copied what had been used in Dr. Calhoun's practice. He also testified he discussed the common risks with all patients.

Davis provided the employees at Pacific Liposculpture with a list of common questions and prepared responses to help them address patient questions. The first question among these was, "Who does the procedure?" The prepared response was:

23

"Rod Davis is our *Director of Surgery* and he performs all of our procedures. *He is nationally certified and specializes in liposculpture*. He has performed over 10,000 procedures, *more than most physicians*. Our office has a perfect safety record, not even an infection, and we have never experienced a serious complication. *Rod is licensed in both California and New York*. [¶] Dr. Jerrell Borup is the Medical Director and has been a board certified physician for 25 years." (Underlining and bold omitted, italics added.)

Davis testified that, at some point, he learned the Medical Board or the Physician Assistant "committee" was investigating the possible illegal practice of medicine at Pacific Liposculpture. He eventually received a one or two sentence letter indicating that the investigation was being closed and no wrongdoing had been found. After the investigation was closed, Davis "felt like we had been put through the most intense scrutiny possible to determine whether or not what we were doing was proper. And finally, I felt like we could breathe easier at that point knowing that what we're doing has been checked out. I even felt like it was probably a good thing that the complaint came so that we could make sure that it's okay." No evidence was offered concerning the scope or particulars of this investigation.

With regard to patient S.M., Davis testified that she appeared for a follow-up visit on May 1, 2013. He gave her a smaller-size compression garment than what she had. He did not attempt to drain the swelling because it "was still firm to palpation. When I pushed on the area, it was not that fluid wave that you would like before you stick a needle into the area." Davis had dealt with seromas in the past, and he felt sufficiently comfortable and knowledgeable to deal with S.M.'s swelling. He did not feel that he needed Dr. Borup's assistance. Davis testified that, contrary to S.M.'s testimony, she came to the office on June 25, 2013. He still opted not to drain the swelling because "it was still firm." He believed that S.M. had either a dissolving seroma or possibly swelling resulting from a compression garment that was too tight. He instructed S.M. to remove

24

the compression garment and increase massage in the area. At some point, he advised S.M. to get a second opinion.

### Davis's Expert—Dr. Terry J. Dubrow

Dr. Terry J. Dubrow, a board certified plastic surgeon, testified on behalf of Davis. Dubrow disagreed with Sundine's conclusion that Davis was not competent to perform the liposuction procedures detailed in his reports. Dubrow testified: Davis "does nothing but liposuction and does a tremendous amount of it. And although I don't see all of the complications he's had, if these are representative of his complications, they are extraordinarily minor. [¶] And in fact, three of these patients don't have any complications, in my opinion."

Dubrow opined that it was reasonable for Davis to have the title "director of surgery." Based on what Davis did day-to-day, Dubrow thought it was not misleading for Davis to hold the title "director of surgery." Asked whether the title could potentially lead people to think Davis was a doctor, Dubrow testified "not necessarily," but "it could." Dubrow testified that seven to eight years prior, the director of surgery at UC Irvine was a nurse. He was also aware of nonphysicians at other unspecified facilities in California who were listed as director of surgery, all of whom were nurses.

Asked if it was reasonable for Davis, a physician assistant, to do liposuction procedures under Dr. Borup, Dubrow responded: "Yes. Provided that Dr. Borup was familiar with liposuction and had a reasonable background in liposuction." Considering Dr. Borup's relevant background and experience, Dubrow testified that it would be reasonable, given Davis's experience performing liposuction, for Dr. Borup to be Davis's supervising physician. Dubrow suggested that the training courses Borup attended provided him with the understanding he needed to supervise someone who performs many liposuction procedures.

With regard to patient S.M., Dubrow testified that the only way to appropriately diagnose a pseudobursa is to aspirate to see whether the fluid returns to the area. Dubrow

25

"couldn't figure out why when [Dr. Batra] made a diagnosis of a fluid collection that he didn't immediately put a needle in it and ascertain whether it was blood or serous fluid and start treating."[15] Dubrow did not agree with Batra's recommendation of immediate surgery for a fluid collection before making a diagnosis. He also did not agree that S.M. had a pseudobursa. Dubrow opined that it was reasonable for Davis to continue to have S.M. wear a compression garment on her right thigh as of May 1, 2013, to treat the residual swelling in the area. He further testified that, based on the patient's status as of May 29, 2013, compression and massage is what he would recommend.[16] Dubrow testified that Davis was managing S.M.'s circumstances with her right thigh, with more compression and massage, "[p]erfectly." Dubrow also testified that, when Davis told S.M. she should go for a second opinion if she was still having doubts, his actions were reasonable. Dubrow did not believe Davis waited too long before suggesting that S.M. go for a second opinion, particularly in light of the fact that her condition had improved with Davis's "conservative therapy." Dubrow testified that Davis's treatment of S.M. was acceptable, conservative, common, and within the standard of care.

On cross-examination, Dubrow acknowledged that, if a practitioner did not discuss potential risks of a procedure with patients, did not present educational videos about those risks, and the patients did not have sufficient time to review the informed consent form which outlined the risks, this would constitute a breach of the standard of care.

---

[15] In his deposition, Dr. Batra testified he spoke with Dr. Borup over the phone to inform him of what had happened with S.M. He told Borup he was not going to treat S.M.'s pseudobursae because her insurance would not pay for it and admonished Borup he should have someone available to deal with this complication.

[16] As noted, Dr. Batra examined S.M. on September 11, 2013.

26

## The Board's Decision

The Board submitted its decision and order dated May 13, 2016, to be effective June 10, 2016, adopting the proposed decision of the ALJ, revoking Davis's physician assistant license. The ALJ concluded that cause existed under sections 3527 and 2234, and California Code of Regulations, title 16, section 1399.521, subdivision (d), to impose discipline on Davis's license because clear and convincing evidence established that Davis: (1) engaged in the unlicensed practice of medicine; (2) was grossly negligent in his post-operative treatment of S.M. in violation of section 2234, subdivision (b); (3) engaged in repeated acts of negligence in his care and treatment of L.W., C.N., K.D., and S.M. in violation of section 2234, subdivision (c); (4) disseminated false and misleading advertising in violation of section 651, subdivisions (a), (b), and (e), and section 2271; (5) engaged in acts of dishonesty in violation of section 2234, subdivision (e), when he disseminated false and misleading advertising; and (6) engaged in conduct that breached the rules or ethical code for physician assistants and which was unbecoming of a physician assistant. The ALJ found that cause for discipline was not established for other charges.[17]

With regard to discipline, the ALJ concluded: "[u]nder the totality of the circumstances presented, the public would not be protected if [Davis] were to retain his license. Careful thought and deliberation was given to alternate disciplinary measures; however, the cumulative nature of [Davis's] conduct, his intentional scheme to circumvent the rules and regulations governing physician assistants, and consideration of

---

[17] The ALJ concluded there was insufficient evidence to establish that Davis failed to maintain adequate and accurate medical records in violation of section 2266 and that he engaged in an extreme departure from the standard of care in his care and treatment of patients L.W., C.N., and K.D. in violation of section 2234, subdivision (b).

27

the overriding concern for public safety require this result. Revocation is the only appropriate measure of discipline that will protect the public."

## Proceedings in the Trial Court

Davis filed a petition for a writ of administrative mandamus seeking, inter alia, a writ compelling the Board to set aside its decision.

In a tentative ruling, the trial court ruled that each of the ALJ's and the Board's determinations were supported by the weight of the evidence. The court also rejected Davis's contention that revocation of his license was excessive and unduly punitive and constituted a manifest abuse of discretion. The trial court concluded: "The factual findings cited to support the level of discipline imposed are supported by the weight of the evidence. The Court finds that reasonable minds could differ over the appropriateness of the penalty imposed premised upon those findings. Therefore, Davis has not shown a manifest abuse of discretion by [the Board] in revoking his license."

Following oral argument, the court stated: "Here is your difficulty: This isn't just an individual who is doing something wrong, this is an individual who went into the practice with the intent to essentially deceive the public and to avoid compliance with the statutes and the regulations. That is what comes across in the record. So it's not just doing something wrong, it's doing something very seriously wrong with an intent to basically avoid compliance with the law." After additional remarks from Davis's counsel, the trial court affirmed its tentative ruling denying the petition.

In an order filed February 24, 2017, the trial court affirmed its tentative ruling, denying Davis's petition for a writ of administrative mandamus and damages. A judgment entered the same day in favor of the Board denied the petition.

## DISCUSSION

### I. Standard of Review

"A writ of administrative mandate is available 'for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a

28

proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal . . . .' " (*Kifle-Thompson v. State Bd. of Chiropractic Examiners* (2012) 208 Cal.App.4th 518, 523 (*Kifle-Thompson*), quoting Code Civ. Proc., § 1094.5, subd. (a).) "Under Code of Civil Procedure section 1094.5 judicial review of a final administrative decision 'shall extend to the questions whether the respondent [agency] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' " (*Fisher v. State Personnel Bd.* (2018) 25 Cal.App.5th 1, 13, quoting Code Civ. Proc., § 1094.5, subd. (b).)

"When it is claimed the findings are not supported by the evidence, and the trial court, as here, is authorized by law to exercise its independent judgment on the evidence, 'abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.' [Citation.] In such a case our review on appeal is limited. We will sustain the trial court's findings if they are supported by substantial evidence. [Citations.] In reviewing the evidence, we 'resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment.' " (*Kifle-Thompson, supra*, 208 Cal.App.4th at p. 523; accord *Pasadena Unified Sch. Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314; see *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 ["Even when, as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test."].)

Where the trial court essentially rejects the petitioner's contention that the administrative agency's findings were not supported by the evidence, and, in doing so,

29

effectively adopts the administrative agency's findings, it is the administrative agency's findings we must examine to determine whether they are supported by substantial evidence. (*Kifle-Thompson, supra*, 208 Cal.App.4th at p. 524.)

## II. Physician Assistants

The Legislature established a statutory scheme for physician assistants out of "concern with the growing shortage and geographic maldistribution of health care services in California . . . ." (§ 3500.) The legislative purposes of this statutory scheme include: "to encourage the effective utilization of the skills of physicians and surgeons, and physicians and surgeons and podiatrists practicing in the same medical group practice, by enabling them to work with qualified physician assistants to provide quality care"; "to encourage the coordinated care between physician assistants, physicians and surgeons, podiatrists, and other qualified health care providers practicing in the same medical group, and to provide health care services"; and "to allow for innovative development of programs for the education, training, and utilization of physician assistants." (*Ibid*.)

A person may not practice as a physician assistant unless licensed. (§ 3503.) To become licensed, a physician assistant must complete an approved program and pass a written examination administered by the Board. (§§ 3517, 3519.) According to the version of section 3502 effective at the time Davis worked with each of the patients here with the exception of S.M.,[18] "Notwithstanding any other provision of law, a physician

---

[18] By the time Davis worked with S.M. in April 2013, and when the Board filed its accusation against Davis in February 2015, subdivision (a) of section 3502 had been amended again, but not in such a way as to affect our discussion of that section here. That amendment to subdivision (a) only clarified that the regulations mentioned were those "adopted under this chapter," and specified that the board referred to was the "Medical Board of California." (Stats. 2012, ch. 332, § 27.) By the time of the trial court's determination, yet another amendment to subdivision (a) added the provision: "The medical record, for each episode of care for a patient, shall identify the physician

30

assistant may perform those medical services as set forth by the regulations of the board when the services are rendered under the supervision of a licensed physician and surgeon who is not subject to a disciplinary condition imposed by the board prohibiting that supervision or prohibiting the employment of a physician assistant." (§ 3502, former subd. (a), as amended by Stats. 2007, ch. 376, § 2.)[19] The regulations further provided: "A physician assistant may only provide those medical services which he or she is competent to perform and which are consistent with the physician assistant's education, training, and experience, and which are delegated in writing by a supervising physician who is responsible for the patients cared for by that physician assistant." (Cal. Code Regs., tit. 16, § 1399.540, subd. (a).)

A physician assistant renders services under the supervision of a licensed physician under a practice agreement that meets certain requirements, also referred to as a delegation of services agreement (DSA). (§§ 3502, subd. (a)(1), (2), 3502.3, 3501, subd. (k).) "[A] physician assistant acts an agent for [the supervising] physician . . . ." (Cal. Code Regs., tit. 16, § 1399.541.) A physician assistant may "[p]erform surgical procedures without the personal presence of the supervising physician which are customarily performed under local anesthesia." (*Id*., subd. (i)(1).)

---

and surgeon who is responsible for the supervision of the physician assistant." (Stats. 2015, ch. 536, § 2.)

[19] As of this writing, subdivision (a) of section 3502 provides: "(a) Notwithstanding any other law, a PA may perform medical services as authorized by this chapter if the following requirements are met: [¶] (1) The PA renders the services under the supervision of a licensed physician and surgeon who is not subject to a disciplinary condition imposed by the Medical Board of California or by the Osteopathic Medical Board of California prohibiting that supervision or prohibiting the employment of a physician assistant. [¶] (2) The PA renders the services pursuant to a practice agreement that meets the requirements of Section 3502.3. [¶] (3) The PA is competent to perform the services. [¶] (4) The PA's education, training, and experience have prepared the PA to render the services." (§ 3502, subd. (a), as amended by Stats. 2019, ch. 707, § 3.)

31

A "supervising physician" was defined, at all times relevant here, to mean "a physician and surgeon licensed by the board or by the Osteopathic Medical Board of California who supervises one or more physician assistants, who possesses a current valid license to practice medicine, and who is not currently on disciplinary probation for improper use of a physician assistant." (§ 3501, former subds. (a)(5), (e).)[20] "A supervising physician shall delegate to a physician assistant only those tasks and procedures consistent with the supervising physician's specialty or usual and customary practice . . . ." (Cal. Code Regs., tit. 16, § 1399.545, subd. (b).) And "[t]he supervising physician has a continuing responsibility to follow the progress of the patient and to make sure that the physician assistant does not function autonomously. The supervising physician shall be responsible for all medical services provided by a physician assistant under his or her supervision" (*Id.*, subd. (f).)

There is a dearth of decisional law related to physician assistants and consequently, we apply the case law related to other licensed professions where appropriate here.

### III.  Unlicensed Practice of Medicine

### A.  Additional Background

The findings of the ALJ, which the trial court concluded supported the determination that Davis engaged in the unlicensed practice of medicine, included the following:  "Throughout the hearing, [Davis] made it clear that he resented performing liposuction surgeries for doctors who he felt were less qualified than him, and who made their living from his work, skills and talents . . . .  [T]o have the control he wanted and get the pay he believed he deserved, [Davis] purposefully . . . set out to create a business arrangement that looked legitimate on paper, but allowed him to . . . run a liposuction

---

[20]  This definition has been since been amended in a way that does not impact our analysis.  (See § 3501, subd. (e), as amended by Stats. 2019, ch. 707, § 2.)

32

business without the interference of a physician. [¶] [Davis] hired Dr. Borup, who may have been well-intentioned, but lacked recent medical experience and was trying to return to medicine after suffering a debilitating stroke that left him unable to practice for 12 years. [Davis] determined, even before the DSA was signed, that Dr. Borup would never perform a liposuction at Pacific Liposculpture. Dr. Borup's entire experience performing liposuction was obtained at a weekend course he attended after he signed the DSA, during which he participated in two liposuctions. He never performed another liposuction . . . . [¶] . . . After his initial observations, Dr. Borup had no involvement in Pacific Liposculpture other than coming by the office occasionally to review a stack of medical records and to pick up his check . . . . [¶] Dr. Borup did not see patients, did not consult with patients, did not perform any administrative duties, and did not participate in Pacific Liposculpture's business . . . . [¶] . . . Dr. Borup allowed [Davis] to operate autonomously and without proper supervision. Although the DSA and other business related agreements complied, on their faces, with the statutes and regulations governing physician assistants and supervising physicians, in practice, the agreements were ignored . . . . Dr. Borup did not appear to be deceitful or coy in his testimony, and it is found that his testimony was sincere; however, there were several times when he was confused and uncertain. Dr. Borup had little . . . idea of what was going on at Pacific Liposculpture. [¶] . . . The evidence demonstrated by clear and convincing proof that Dr. Borup allowed [Davis] to operate autonomously in violation of California Code of Regulations, title 16, section 1399.545, subdivision (f). [¶] . . . The evidence [also] demonstrated by clear and convincing proof that liposuction surgery was not consistent with Dr. Borup's specialty or his usual and customary practice. He improperly delegated medical tasks and procedures to [Davis]. [¶] . . . [Davis's] liposuction practice was not conducted under the type and level of physician supervision required within the meaning of . . . section 3502 . . . . [¶] . . . [Davis's] actions and business relationship with Dr. Borup circumvented [the purpose of the Act] and the supervision required before [Davis]

33

could perform certain medical services. Under . . . section 2052, an individual must have a valid medical license to advertise or hold himself out as practicing any system or mode of treating the sick, or to diagnose or treat any blemish, deformity, disfigurement, or other physical or mental condition. Section 3502 authorizes a licensed physician assistant to perform medical services authorized by the regulations 'when the services are rendered under the supervision of a licensed physician and surgeon.'[21] [Clear and convincing evidence establishes Davis] did not render services under Dr. Borup's supervision. He practiced medicine without appropriate delegated authority, exceeded the delegated scope of practice, and practiced without adequate supervision . . . . [¶] . . . [Davis] contended that his actions did not constitute the unlawful practice of medicine without a license. In support, he argued that the regulations allow physician assistants to perform liposuctions under a local anesthesia without the personal presence of a supervising physician. [Davis's] argument is misplaced. Had [Davis] been properly supervised as required by law, he may have been allowed to perform liposuctions under a local anesthetic, but this decision does not reach that issue. The conclusion that [Davis] engaged in the unlawful practice of medicine does not rely on whether liposuction is regularly performed under local anesthesia. . . . [¶] . . . [T]his decision . . . finds that [Davis] choreographed a medical practice that ensured he would not be properly supervised as a physician assistant. Clear and convincing evidence established that [Davis] engaged in the unlawful practice of medicine without a license."

## B. Davis's Contentions

Davis asserts that the ALJ's findings, upon which the Board and the trial court relied, that he engaged in the unlicensed practice of medicine are not supported by

---

[21] The ALJ was quoting section 3502, former subdivision (a). See the discussion describing the former subdivision (a) in part II. of the Discussion, and the amendments in fns. 18 and 19, *ante*.

34

substantial evidence.  He also asserts that the "evidence shows there was never any intent or act of [him] practicing medicine without a license."  He emphasizes that he did not hold himself out as a physician, he had a DSA with Borup, he had consulted an experienced, published lawyer in the field, he sought guidance from the Board, and he received approval from his probation monitor.  Davis asserts that Borup had sufficient knowledge and ability to serve as supervising physician, and he acted in compliance with all of his supervisory requirements.

## C.  Analysis

Section 2052 provides in pertinent part:  "(a) . . . any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense . . . .  [¶]  (b) Any person who conspires with or aids or abets another to commit any act described in subdivision (a) is guilty of a public offense . . . .  [¶]  (c) The remedy provided in this section shall not preclude any other remedy provided by law."

### 1.  Improper Delegation

As noted, California Code of Regulations, title 16, section 1399.545, subdivision (b), provides:  "A supervising physician shall delegate to a physician assistant only those tasks and procedures *consistent with the supervising physician's specialty or usual and customary practice* and with the patient's health and condition."  (Italics added.)

Borup had been a licensed physician in California since 1983.  But he was board certified in anesthesiology and never did a general surgical residency.  While he testified he "did surgery during [his] internship for a month and a half," he also testified that an

35

intern in this capacity does not actually perform surgery. "You just hold the things for the surgeon to do the same. You're just observing to help him keep things out of his way." Borup never actually performed any surgery during his internship. He held various anesthesiology positions between 1982 and 1998, in which he did not perform surgeries, although he did observe many. Borup had a stroke after practicing as an anesthesiologist for approximately 18 years and did not practice medicine for 12 years, between 1998 and 2010.

At the time of his first interview at Pacific Liposculpture in 2010, Borup had "approximately two months' experience in the anti-aging field," which consisted of attending classes and meetings. After the interview, Borup attended a program on liposuction in September 2010. The program "was about a week of video and didactic. And then at the end -- it was a weekend -- two days of hands-on." Borup performed two procedures during the weekend course under the observation of a "teacher." He did not describe the nature of the procedures he performed. Nor did he discuss the background and experience of the "teacher." The entirety of Borup's practical liposuction surgery experience consisted of this two-day, two-procedure training. At Pacific Liposculpture, Borup did not perform a single procedure.

Dr. Sundine, the Board's expert, opined that Borup did not meet the minimum qualifications for performing liposuction surgery. Borup's specialty was not liposuction; nor was it Borup's usual and customary practice. Indeed, as Sundine noted, Borup "never really practiced it. He took a short course to do it, with -- having no surgical training. And then from my review of the record . . . , he had only done one or two cases . . . ."

As the Board points out, Davis's expert, Dr. Dubrow, acknowledged that it was "hard for [him] to call a specialist in liposuction someone who just learned how to do liposuction." He further testified that it was hard to say that liposuction was someone's usual and customary practice if the person had just learned liposuction.

36

Davis testified on cross-examination that Borup's specialty was liposuction surgery, but that it "was a new specialty for him . . . ." He acknowledged the relevant training and experience on which he relied in concluding that liposuction surgery was Borup's specialty was the single course Borup took and the two procedures he performed in a weekend class.

We conclude the ALJ's determination that Dr. Borup was not competent to delegate the relevant tasks and procedures to Davis is supported by substantial evidence. Borup was a career anesthesiologist who, following a 12-year hiatus from the practice of medicine, decided to explore anti-aging medicine, attended some classes, and performed two unspecified procedures under the supervision of a "teacher." Substantial evidence supports the ALJ's determination that liposuction surgery did not constitute Borup's specialty or usual and customary practice. Because a "supervising physician shall delegate to a physician assistant *only those tasks and procedures consistent with the supervising physician's specialty or usual and customary practice* and with the patient's health and condition" (Cal. Code Regs., tit. 16, § 1399.545, subd. (b), italics added), and because the ALJ's determination that liposuction surgery was not Borup's specialty or usual and customary practice was supported by substantial evidence, the ALJ did not err as a matter of law in concluding that Borup "improperly delegated medical tasks and procedures to" Davis.

### 2. Functioning Autonomously

As noted, California Code of Regulations, title 16, section 1399.545, subdivision (f), provides: "The supervising physician has continuing responsibility to follow the progress of the patient and to make sure that the physician assistant *does not function autonomously*. The supervising physician shall be responsible for all medical services provided by a physician assistant under his or her supervision." (Italics added.) Thus, a physician assistant cannot function autonomously.

37

According to Moscoso, during the first interview, Borup indicated that he was not interested in preforming liposuction. Also according to Moscoso, Davis told Borup that "he was performing all the lipo procedures himself and that he didn't need any help in that regard. He didn't need anybody in the OR, and this would be more like a [*sic*] off-site type of supervisory experience." After the interview, Davis was happy, calling the prospective situation "perfect"—"someone that is not going to be involved with the company, with the day-to-day procedures." In an e-mail to Moscoso, Davis stated, " 'I hope that [Borup] will be able to stick with our system once has [*sic*] some knowledge.' " By this, according to Moscoso, Davis was referring to the structure that had been discussed in the interview with Borup, whereby Borup would "stay away . . . from the company and the daily operations." Davis also stated in the e-mail, " 'We don't want another clumsy physician getting in the way.' "

Davis maintains that the "clumsy physician" e-mail was misrepresented by the Board as suggesting that Davis wanted autonomy in his practice. Davis asserts that this passage was "taken out of context." According to Davis, the "clumsy physician" remark was a reference to Dr. Calhoun, for whom he had previously worked, and Davis's desire to avoid at Pacific Liposculpture the problems that arose at Dr. Calhoun's office, including Calhoun's lack of experience performing liposculpture, Calhoun's difficultly converting consultations into procedures, and his poor staff management skills. While the ALJ did not rely on the email in the evaluation and analysis portion of the decision pertaining to the unlicensed practice of medicine, the ALJ did discuss the e-mail in another portion of the decision, concluding that the e-mail demonstrated Davis's desire to operate Pacific Liposculpture "without interference from anyone, particularly a physician." We conclude that it could be reasonably inferred from the e-mail that Davis desired and intended to function autonomously at Pacific Liposculpture, free from any interference in the form of "another clumsy physician getting in the way."

38

In addition, the evidence established that the business arrangement Davis engineered was designed to facilitate autonomous functioning. As Sundine opined, Pacific Liposculpture "was set up so that [Davis] absolutely did function autonomously." At a second interview approximately two weeks after the first, Davis and Borup discussed the "structure" of the arrangement, "that [Borup] basically could be away from the office and should be away from the office, enjoying his retirement." Ultimately, Davis selected Borup as medical director because, unlike the other candidate, Borup did not want to get involved in the day-to-day operations. Initially, Borup was to receive 10 percent of the practice's gross revenues, but before the practice issued its first check to Borup, the percentage was renegotiated to five percent because Davis felt 10 percent was too much to pay Borup "for not doing anything." As noted, Borup never performed a liposuction procedure at Pacific Liposculpture.

Davis acknowledged that he "preferred to be the primary provider of lipo." When he was asked if he made this clear to Borup, Davis replied: "We had a couple of discussions about it. And the way that I phrased it was, 'I want to get things off the ground. Let me get this going, of course, under your supervision. But I know that we need to have good photos on the website. We need to have good reviews.' " He testified that there was " always this promise floating in the air that one day after [Davis] got some of these procedures under our belts and we had a good reputation going that we would then start to do more stuff together." However, Davis noted that patients would be coming into the practice having seen photographs of results achieved by him, not Dr. Borup. Therefore, according to Davis, "it seemed more straightforward to just have the person whose work is displayed on the site" perform the procedures. Davis further testified he thought they could "avoid more problems by making sure we stayed consistent with that versus having Dr. Borup . . . practicing on people just for the sake of practicing and maybe ending up with some 19-year-old woman who's very upset with some results because she looked at photos and thought that she was going to get

39

something similar to what was in the photos rather than a doctor who was . . . just practicing just to practice." Davis was concerned that Dr. Borup was not as skilled when it came to the artistic aspect of the liposuction procedures. "He could do a procedure safely. . . . But making sure that everything looked smooth and the patient's happy, that's -- I thought I would be better at that part." On cross-examination, Davis admitted that he did not want Borup performing any procedures.

The scripted answer Davis prepared for employees with which to respond when clients or potential clients asked who performed the procedures at Pacific Liposculpture is additional evidence establishing that he was functioning autonomously. It read, in part: "Rod Davis is our Director of Surgery *and he performs all of our procedures*." (Bold omitted, italics added.)

The ALJ's findings that Davis set out to create a practice where he could operate without the interference of a physician, that Davis determined that Dr. Borup would not perform liposuction at Pacific Liposculpture, that Dr. Borup's involvement in the practice was extremely limited, and that Dr. Borup allowed Davis to operate autonomously with no meaningful supervision are all supported by substantial evidence. We conclude that the ALJ did not err as a matter of law in determining that Davis functioned autonomously at Pacific Liposculpture in violation of California Code of Regulations, title 16, section 1399.545, subdivision (f).

### 3. Davis's Additional Contentions Regarding the Unlicensed Practice of Medicine Allegation

#### a. Intent to Practice Without a License

Davis asserts that the "evidence shows there was never any *intent* or act of [Davis] practicing medicine without a license." (Italics added.) Davis has not shown that a finding of intent to violate the law was required to impose discipline.[22]

The Board relies on *Khan v. Medical Board* (1993) 12 Cal.App.4th 1834 (*Kahn*) for the premise that it was not required to prove intent. At issue in *Khan* was, among other things, section 2264, which provides: "The employing, directly or indirectly, the aiding, or the abetting of any unlicensed person or any suspended, revoked, or unlicensed practitioner to engage in the practice of medicine or any other mode of treating the sick or afflicted which requires a license to practice constitutes unprofessional conduct." The *Khan* court noted that section does not contain qualifying words such as "knowingly" or "intentionally." (*Khan*, at pp. 1844-1845.) The court concluded: "[t]he Legislature's failure to include 'knowingly' or 'intentionally' or other qualifying words signals that it did not intend either guilty knowledge or intent to be elements of the unprofessional conduct of violating section 2264 by employing an unlicensed person." (*Khan*, at p. 1845.) The court also concluded that reading an intent element into the statute "would not further the Legislative purpose of public protection." (*Ibid*.) Thus, the court held that "section 2264 does not require a showing of either knowledge or intent on the part of the practitioner." (*Khan*, at p. 1845.) Section 2052, at issue here addressing the unlicensed

---

[22] We could consider Davis's scienter argument forfeited. He does not provide any argument or citation to authority in support of the contention that the Board was required to establish he intentionally engaged in the unlicensed practice of medicine. (See *Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1; accord, *Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 858, fn. 10 [passing argument unsupported by citation to authority or evidence deemed forfeited]; see Cal. Rules of Court, rule 8.204(a)(1)(b).) We will nevertheless address it because the Board did.

41

practice of medicine, likewise does not contain qualifying words such as "knowingly" or "intentionally." (§ 2052, subd. (a).) Further, like section 2264, section 2052 serves the purpose of protecting the public. We conclude that it, too, does not require a showing of knowledge or intent. (*Khan*, at pp. 1844-1845; see also *Sternberg v. California State Bd. of Pharmacy* (2015) 239 Cal.App.4th 1159, 1166-1169 [concluding that because section 4081, pertaining to drug record keeping requirements of pharmacists-in-charge, did not contain an express knowledge requirement, no such requirement was intended by the Legislature to impose discipline; reasoning that such interpretation supports public protection goal of the statute; distinguishing criminal statutes from license discipline statutes, which are civil in nature and designed to protect the public].)

Moreover, even if intent was an element, we would conclude that the existence of such intent was supported by the evidence here. Davis was not a licensed physician. He performed procedures which, if performed by a lay person, would constitute the unlicensed practice of medicine. (See generally § 2052, subd. (a).) Central to this case, of course, is Borup's purported supervision of Davis. We have concluded that Borup lacked the authority to delegate the liposculpture procedures to Davis because they were not consistent with Borup's specialty or usual and customary practice. (Cal. Code Regs., tit. 16, § 1399.545, subd. (b).) Davis was fully apprised of Borup's background and experience. We have also concluded that substantial evidence supports the determination that Davis functioned autonomously in violation of California Code of Regulations, title 16, section 1399.545, subdivision (f). We further conclude that substantial evidence, summarized in parts III.C.1. and III.C.2. of the Discussion, *ante*, supports the determination that Davis *intended* to perform these procedures knowing they were not consistent with Borup's specialty or usual and customary practice, and that Davis intended to operate autonomously. Indeed, substantial evidence supports the conclusion that this was Davis's very aim in the establishment and operation of Pacific

42

Liposculpture. His contention that there was no showing that he had the intent to practice medicine without a license is meritless.

### b. Supervising Physician's Duties and Davis's Responsibility

According to Davis, the duties relied on by the ALJ and the trial court are the supervising physician's duties, not the physician assistant's duties, and it was Dr. Borup's responsibility to satisfy these duties, not Davis's. Davis asserts that, in finding that he engaged in the unlawful practice of medicine, the trial court improperly placed the burden of ensuring Borup's compliance with his duties on Davis.

As noted, at the relevant times, section 3502 provided that a physician assistant "may perform those medical services as set forth by the regulations of the board when the services are rendered under the supervision of a licensed physician and surgeon who is not subject to a disciplinary condition imposed by the board prohibiting that supervision or prohibiting the employment of a physician assistant." (§ 3502, former subd. (a).) A necessary corollary to this statutory provision is that a physician assistant may not perform such medical services where they are not rendered under the supervision of a physician. Substantial evidence supports the determination that Davis did engage in the unlicensed practice of medicine by performing tasks and procedures not consistent with his supervising physician's specialty or usual and customary practice (Cal. Code Regs., tit. 16, § 1399.545, subd. (b)), and by functioning autonomously (*id*., subd. (f)). Moreover, substantial evidence establishes that Davis orchestrated every salient detail of this arrangement. He sought out and found an essentially retired physician with virtually no experience in the field who would not perform any procedures or participate in any day-to-day activities at Davis's practice, the very purpose for which Davis hired him. Davis then proceeded to perform all liposuction procedures at Pacific Liposculpture with no meaningful supervision. That these matters also implicated his supervising physician's duties does not insulate Davis from a finding that he engaged in the unlicensed practice of medicine, or from being disciplined for doing so.

43

### c. Compliance with Statutory File-review Requirement

Davis repeatedly relies on the fact that Borup purportedly reviewed a higher percentage of the medical files than he was required to by law. Prior to the 2019 amendment to section 3502, effective January 1, 2020, and at all times relevant here, subdivision (c)(2) of that section provided: "The supervising physician and surgeon shall use one or more of the following mechanisms to ensure adequate supervision of the physician assistant functioning under the protocols: [¶] . . . The supervising physician and surgeon shall review, countersign, and date a sample consisting of, at a minimum, 5 percent of the medical records of patients treated by the physician assistant functioning under the protocols within 30 days of the date of treatment by the physician assistant." (§ 3502, former subd. (c)(2); see also Cal. Code Regs., tit. 16, § 1399.545, subd. (e)(3).)

The ALJ rejected Davis's argument that "Borup went above and beyond his obligation to review five percent of the medical records he was required to review in his capacity as a supervising physician, and that Dr. Borup actually reviewed ninety[23] percent of them." The ALJ stated that the medical records signed by Borup presented at the hearing were not dated, and therefore it could not be determined whether they were reviewed within 30 days of treatment. The files Borup reviewed and signed, other than a progress note concerning S.M., indeed do not indicate the date of Borup's review. More importantly, however, Davis fails to offer any reason why Borup's compliance with the statutory and regulatory five percent review requirement would preclude a finding of unlicensed practice of medicine where such a finding is otherwise supported by the statutory and regulatory requirements and the evidence we have discussed.

---

**23** Borup actually testified he reviewed "close to 60 percent, maybe even 67 percent. But it was definitely over 50 percent."

### d. Reliance on Handbook and Legal Consultation

Davis argues that he consulted the *California Physician's Assistant's and Supervising Physician's Handbook*, and the attorney author Michael Scarano, who had been General Counsel to the California Academy of Physician Assistants.[24] Therefore, according to Davis, he "had every reason to believe his arrangement with Dr. Borup was legal and proper."

Specifically, Davis asserts he relied on the following passage: "Increasingly, enterprising PAs are seeking and assuming management roles in the medical practices in which they work. For example, a PA will often be the instigator of a plan to open a practice in a rural or urban underserved area, and will enlist the assistance of a partially retired physician... Once the practice is up and running, the PA may need to serve as both the primary on-site practitioner and the practice administrator, with the physician perform[ing] [the] clinical obligations of an SP [supervising physician] through electronic communication and periodic visits to the practice." In his appellate briefing, Davis also relies on the following passage: "the practice may be owned by a semi-retired physician who wants the PA to assume most of the administrative and patient care duties on a day-to-day basis." Both passages are from the chapter titled, "The PA's Potential Role in Practice Ownership and Management."

However, as the Board points out, the handbook also includes the following from the chapter titled, "PA Scope of Practice and Supervision Requirements": "PA's are 'dependent practitioners.' This means that their authority to practice derives from a delegation of authority from a supervising physician. Absent such delegation, a PA has

---

[24] There is no evidence in the record describing the nature of Davis's consultation with Scarano or what Davis told Scarano concerning the nature of the practice or the "system" Davis conceived for Pacific Liposculpture. Nor is there any evidence establishing what Scarano told Davis or what advice, if any, he gave.

no legal authority to perform medical services and is technically engaged in the unlawful practice of medicine." Of course, both passages Davis relies upon necessarily assume the referenced physician qualifies as a supervising physician who could give a valid delegation of authority. Borup did not, and the evidence shows Davis knew it.

In any event, in a case on which the Board relies, *Norman v. Department of Real Estate* (1979) 93 Cal.App.3d 768 (*Norman*), the court held that even acts committed in good faith, that are not deemed willful, and which were undertaken in accordance with legal advice, are not immune from discipline. (*Id.* at p. 778.) *Norman* involved licensed real estate agents. The *Norman* court wrote: " 'No merit is seen in appellants' insistent contentions that since their acts were in good 'faith,' and not 'willful,' and in accordance with 'legal advice,' they were improperly subjected to discipline. Disciplinary procedures provided for in the Business and Professions Code . . . are to protect the public not only from conniving real estate salesmen but also from the *uninformed, negligent, or unknowledgeable salesman*.' [Citation.] Their purpose 'is not to punish but to afford protection to the public . . . ' " (*Ibid*.) Although *Norman* involved discipline imposed by the Department of Real Estate as opposed to the Physician Assistant Board, the principles are the same. Davis is not immune from discipline merely because he consulted the *California Physician's Assistant's and Supervising Physician's Handbook* and its attorney author, even if he did so in good faith.

### e. Equitable Estoppel

Davis asserts that, because Dr. Borup was approved by Davis's probation monitor, the Board should be estopped from finding that Borup was not qualified to be Davis's supervising physician and that Davis engaged in the unlicensed practice of medicine.

" ' "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be

46

ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' "
(*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 37 (*Honeywell*).)

Davis testified that, as a condition for his initial California probationary license, he was required to obtain preauthorization of his supervising physician. His probation monitor was Dennis Rodriguez. With regard to Davis's employment with Dr. Bittner, he testified that Rodriguez came to Bittner's office and met with both Davis and Bittner. According to Davis, he and/or Bittner made clear to Rodriguez that Davis would be performing liposuction procedures on patients. Eventually, they received approval from Rodriguez.

Davis subsequently got approval from Rodriguez when Davis went to work for Dr. Calhoun. Rodriguez came to the office and met with both Davis and Dr. Calhoun. Davis testified they submitted to Rodriguez their DSA, Dr. Calhoun's license number, and "a few other forms." Asked if he made it clear to Rodriguez he would be performing liposuction for Dr. Calhoun, Davis responded, "It was necessary to be as clear as possible, especially with a probationary license."

Davis testified that when Dr. Borup became his supervising physician, he was still in probationary status and Rodriguez was still his monitor. In this instance, Davis did not have an in-person meeting with Rodriguez. Davis testified: "I believe he said it was because there was only a couple of months left in probation, and things had been going fine with the probation. There had been no violations thus far. And he could just check it out from his end with Dr. Borup. As long as I sent in the same paperwork, he would check it out and get back to me if he's approved or not." Davis testified he could not recall whether he sent Borup's CV to Rodriguez, but he did send the first DSA he and Dr. Borup adopted as well as "the other supervisory forms." Davis testified that he was approved to work with Dr. Borup as his supervising physician. Davis did not call Rodriguez to testify on his behalf.

47

The elements for the imposition of equitable estoppel are not established on this record. Regarding the first element, we cannot say here that the party to be estopped, the Board, was apprised of the true state of facts based on the representations made by Davis to Rodriguez. The evidence does not establish the particulars or what Davis told Rodriguez and the record does not contain copies of all of the documents Davis provided concerning the arrangement with Dr. Borup. While it is conceivable that Rodriguez and the Board could be charged with knowledge concerning the extent of Borup's qualifications and his resulting inability to properly delegate authority to Davis, the evidence does not establish as much. And in any event, the Board could not be charged with knowing the extent to which Davis intended to and did operate autonomously. Davis cannot seek to impose an estoppel against the Board without establishing that relevant and truthful information was communicated to Rodriguez and the Board so the Board would be apprised of the relevant facts. As to the third element, Davis could not be said to be ignorant of the true state of facts. He knew what the true facts were. Thus, at least two of the four elements required for the imposition of equitable estoppel are not present here. (*Honeywell, supra*, 35 Cal.4th at p. 37.)

In any event, equitable estoppel "ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy." (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 793.) Here, we have concluded that substantial evidence supports the conclusion that Davis engaged in the unlicensed practice of medicine because his purported supervising physician could not properly delegate the relevant authority to Davis and because Davis functioned autonomously. Under these circumstances, we cannot say that employing estoppel is necessary to avoid grave injustice, or that doing so would not defeat a strong public policy. (*Ibid.*; accord *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493 ["an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for

48

the benefit of the public' "].)  Instead, we conclude the contrary.  Section 3504.1 provides:  "Protection of the public shall be the highest priority for the Physician Assistant Board in exercising its licensing, regulatory, and disciplinary functions."  That same provision further states:  "Whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount."

Thus, we disagree with Davis that the Board should be estopped from finding Borup not qualified to be Davis's supervising physician, and that Davis engaged in the unlicensed practice of medicine, based on the prior approval of Borup by Davis's probation monitor.[25]

### f.  Reliance on Closure of Prior Investigation

Davis also relies on the fact that the Medical Board closed a prior investigation into Borup's alleged aiding and abetting Davis's illegal practice of medicine.  Davis asserts that he understood this as approval of "his practice under Dr. Borup."  To the extent that Davis implies an equitable estoppel argument, in this regard, the argument is without merit for the reasons stated in part III.C.3.e. of the Discussion, *ante*.  Furthermore, the full record, including all allegations, findings, and conclusions, of the prior investigation are not in the record.  Thus, the conduct and disposition of the prior complaint and investigation into Borup's alleged aiding and abetting Davis in the illegal practice of medicine is not dispositive of the matters here.

### 4.  Conclusion - Unlawful Practice of Medicine

We conclude that substantial evidence supported the ALJ's determination that Davis performed procedures Borup was incompetent to delegate in violation of California Code of Regulations, title 16, section 1399.545, subdivision (b), and that Davis functioned autonomously in violation of California Code of Regulations, title 16, section

---

[25]  In light of our determination, we need not address the additional grounds on which the Board relies in asserting that equitable estoppel should not apply here.

49

1399.545, subdivision (f).  Therefore, substantial evidence supported the ALJ's determination that Davis engaged in the unlicensed practice of medicine, and the ALJ did not err as a matter of law in reaching this conclusion.

## IV.  Gross Negligence — Patient S.M.

### A.  Additional Background

In finding that Davis was grossly negligent in his care and treatment of S.M., the ALJ stated:  "Clear and convincing evidence established that [Davis] engaged in an extreme departure from the standard of care and that he committed gross negligence in his post-operative care and treatment of patient SM.  Dr. Sundine opined that [Davis] should have aspirated the patient's lump and referred her to Dr. Borup, and that his failure to do so was an extreme departure from the standard of care.  Although Dr. Dubrow disputed that SM had a pseudo bursa and agreed with [Davis's] initial recommended post-operative care, Dr. Dubrow did not examine SM.  Additionally, he conceded that SM's lump should have been drained if it had not resolved itself after a period of time.  Dr. Batra, a plastic surgeon and SM's subsequent treating physician, examined SM, and concluded that she had a pseudo bursa that should have been aspirated.  Based on the totality of the evidence, Dr. Sundine's opinion was more persuasive than Dr. Dubrow's on this issue.  [Davis] was grossly negligent in his care and treatment of patient SM."

### B.  Davis's Contentions

Davis asserts the finding that he committed gross negligence in his post-operative treatment of S.M. is not supported by substantial evidence.  Davis asserts he "did not consult with Dr. Borup with respect to S.M., because [he] thought he was competent to address the lump" on his own.  He further asserts his conservative treatment of S.M., which was endorsed by Dr. Dubrow, was appropriate.  Davis also emphasizes that, ultimately, he did refer S.M. to a physician three months after the procedure.

## C. Analysis

Gross negligence is " 'the want of even scant care *or* an extreme departure from the ordinary standard of conduct.' " (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 138, italics added; accord *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.) "The use of the disjunctive in the definition indicates alternative elements of gross negligence—both need not be present before gross negligence will be found." (*Kearl v. Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1053 (*Kearl*).)

S.M. testified that approximately five weeks after her procedure, a sack of fluid formed on her right thigh. She discussed the development with Davis at a follow-up appointment. Davis told S.M. that the condition was normal, that she had nothing to worry about, and that it would go away. Davis did not offer S.M. the option of seeing a supervising physician. As time passed, the swelling did not dissipate, and actually grew harder. S.M. contacted Davis again the following month and sent him photographs. Davis called in a prescription to S.M.'s pharmacy, and she took the medication. Thereafter, S.M. communicated to Davis that the swelling had not diminished and that it was "very hard." Additionally, a bruise had formed at the site of the swelling. S.M. grew concerned that she might have a seroma that could require additional surgery if it was not drained. S.M. again contacted Davis. Again, Davis did not offer to have S.M. seen by a supervising physician. S.M. ultimately decided to go elsewhere for treatment. S.M. went to her primary care physician, who had an ultrasound performed and then referred her to Dr. Batra, a plastic surgeon. Unlike Davis's expert, Dr. Dubrow, Dr. Batra actually examined S.M. He diagnosed the condition on her right thigh as a pseudobursa. He characterized the condition as "obvious" and testified, "it looks like hell." He informed S.M. that surgery was required to remove it, and that it would leave a scar and possibly an indentation.

Dr. Sundine, the Board's expert, concluded that, while Davis's initial management of S.M.'s seroma was appropriate, as the matter persisted, Davis should have been more aggressive. He testified that beyond "a couple weeks . . . you want to start thinking that you might need to do something else." According to Sundine, when more aggressive treatment was called for, a physician's assistant should have brought the matter to the attention of a supervising physician, and Davis's failure to do so violated the applicable standard of care. In his report, Sundine found it "amazing" that Davis "did not recognize the seroma which could have been easily diagnosed with an ultrasound or something as simple as a needle aspiration." Sundine stated: "By failing to treat the seroma early the patient will now require excision of the pseudo-bursa as proposed by Dr. Batra . . . ." Sundine characterized Davis's performance in this regard as an "[e]xtreme departure."

For his part, Davis testified that he had dealt with seromas in the past, and he felt sufficiently comfortable and knowledgeable to deal with S.M.'s condition. He did not feel he needed Dr. Borup's assistance. Davis's notes indicate he recommended, in a text message, that S.M. go for a second opinion.[26] This was two and a half months after S.M.'s April 17, 2013, procedure.

In short, over the two and a half months between S.M.'s procedure and the date on which he first raised the possibility of S.M. getting a second opinion via text, Davis continued in unsuccessfully trying to remedy S.M.'s condition himself. Initially he simply insisted to her that everything would be fine. He steadfastly refused to acknowledge that consultation with a physician was warranted and appropriate because

---

[26] This text message was dated July 2, 2013, and stated: "Tried calling u. A hematoma would be black and blue rather than just swelling. U should go for a second opinion if u r having doubts. Otherwise u will continue to read horror stories online."

he felt he did not need the assistance of his supervising physician.[27] As a result, S.M. was left with a condition which, if treated differently earlier, could have been resolved, but as a result of Davis's post-operative care, will require additional surgery that will result in a scar and cost $11,500.

Resolving all conflicts in favor of the Board and giving the Board the benefit of every reasonable inference in support of the judgment as we are required to do under the substantial evidence test (*Kifle-Thompson, supra*, 208 Cal.App.4th at p. 523), we conclude that substantial evidence supports the ALJ's determination that Davis acted with gross negligence in his post-operative care of S.M. Sundine, the Board's expert, considered Davis's post-operative care of S.M. to be an "extreme departure." The testimony of a qualified expert witness found to be credible by the Board, the ALJ, and the trial court may alone "provide substantial evidence to support a finding of gross negligence." (*Kearl, supra*, 189 Cal.App.3d at p. 1053.) Any conflict between Sundine's testimony and that of Davis and his expert, Dr. Dubrow, "must be resolved in favor of the judgment." (*Ibid.*)

We conclude that substantial evidence supports the ALJ's determination that Davis's post-operative care of S.M. constituted gross negligence.

---

[27] In asserting that he thought he was competent to address the issue, Davis relies on California Code of Regulations, title 16, section 1399.540, subdivision (d). That section provides, "[a] physician assistant shall consult with a physician regarding any task, procedure or diagnostic problem *which the physician assistant determines exceeds his or her level of competence* or shall refer such cases to a physician." (Cal. Code Regs., tit. 16, § 1399.540, subd. (d), italics added.) However, a physician assistant's failure to acknowledge that a problem exceeds his or her level of competence, where appropriate, cannot be deemed to shield the physician assistant from a finding of gross negligence.

## V. False and/or Misleading Advertising

### A. Additional Background

In finding that Davis engaged in false and/or misleading advertising, the ALJ stated: "Pacific Liposculpture advertised its services on the internet. At various times, the advertisements contained false and misleading statements, particularly as related to Dr. Borup and the 'experienced team' of professionals who performed liposuctions. [Davis] admitted the falsity of some of the content of Pacific Liposculpture's website, but contended he was not responsible for posting content on the website. Evidence at the hearing established [Davis] was involved in approving the content of the website and, as CEO of Pacific Liposculpture, Inc., he was further responsible for its content. The evidence also showed [Davis] regularly reviewed Pacific Liposculpture's website and knew, or should have known, it contained false and misleading statements. [¶] . . . [¶] [Davis's] use of the title Director of Surgery, in conjunction with his being the medical practitioner performing all the liposuction surgery at Pacific Liposuction [*sic*] and his failure to define his credentials and rely instead upon the abbreviations 'P.A.' or 'PA – C,' constitutes misleading advertising. [¶] . . . The evidence showed by clear and convincing proof that [Davis] disseminated false and misleading advertising."

### B. Davis's Contentions

Davis asserts the finding that he engaged in false and/or misleading advertising is not supported by substantial evidence. He asserts the advertising was "substantially accurate and was created without intent to mislead the public." He also contends that he advised his staff not to address him as "doctor," corrected patients who erroneously addressed him as doctor, and never represented that he was a doctor. Davis further contends that use of the title "Director of Surgery" did not imply that he was a physician, and that the title was appropriate because he was the person performing the surgery and overseeing the management of the surgical suite. He asserts that the informed consent forms were amended to be clearer about who would perform the procedures. Davis also

asserts that he attempted in good faith to monitor the Pacific Liposculpture Yelp page to correct consumer posts referring to him as "doctor," and further asserts that any failure to speedily correct third-party comments on Yelp is not a proper ground for discipline.

## C. Analysis

In this context, a "false, fraudulent, misleading, or deceptive statement, claim, or image includes a statement or claim . . . that does any of the following":  "Contains a misrepresentation of fact"; "[i]s likely to mislead or deceive because of a failure to disclose material facts"; "[i]s intended or is likely to create false or unjustified expectations of favorable results"; "[c]ontains other representations or implications that in reasonable probability will cause an ordinarily prudent person to misunderstand or be deceived"; and/or "[i]ncludes any statement, endorsement, or testimonial that is likely to mislead or deceive because of a failure to disclose material facts."  (§ 651, subd. (b)(1),(2),(3)(A),(5),(8); see also § 17500.)

Moscoso testified that, once the company was established, Davis took responsibility for marketing Pacific Liposculpture away from him.  From Borup's resume, Davis created Borup's biographical information for the website, which appeared under the title, " 'Meet Our Medical Director.' "  Moscoso testified that Davis was interested in downplaying the fact that Borup was not a plastic surgeon.

We have previously noted the biographical information for Borup on the Pacific Liposculpture website.  (See fn. 4, *ante.*)  Versions of that information contained a number of statements relevant here.

The website stated:  "*Dr. Borup, along with* his highly trained liposculpture *team*, will help to minimize your risks while offering you the best possible care all under local anesthesia!"  (Italics added.)  Neither Dr. Borup nor members of any "highly trained liposculpture team" other than Davis could be said to have done anything to minimize risks while offering the best possible care.

The website also stated: "Dr. Borup supervises *a team of highly trained liposuctionists* with a combined experienced [*sic*] of well over 10,000 lipo procedures." As pertinent here, Webster's Dictionary defines the word "team" to mean: "a number of persons associated together in work or activity: such as [¶] a: a group on one side (as in football or a debate) [¶] b: crew, gang." (Merriam-Webster Online Dict. <https://www.merriam-webster.com/dictionary/team> [as of April 1, 2021], archived at <https://perma.cc/AFJ6-HWTW>, capitalization omitted.) Yet, only one person—Davis—was involved in the liposuction procedures. There was no "team" of "highly trained liposuctionists." Moreover, the evidence established that Borup did not meaningfully supervise Davis at all.

The website stated: "*Because of Dr. Borup's advanced training and expertise in liposuction technology*, PacificLipo's procedures significantly reduce pain, swelling and bruising, while providing you with smoother results, tighter skin, permanent improvements, and no unsightly scars." (Italics added.) However, Borup did not have "advanced training and expertise in liposuction technology." Moreover, even if one could consider Borup to have such advanced training and expertise in liposuction technology, because he was not involved in the procedures or their supervision, there was no cause and effect between Borup's purported "advanced training and expertise in liposuction technology" and the reduction in pain, swelling, and bruising, and "smoother results, tighter skin, permanent improvements, and no unsightly scars."

The website stated: Borup was "highly published." Yet, he had published but one article. That publication was in 1983, appears to have been coauthored with two other individuals and had nothing to do with liposuction.

The website stated: "Dr. Borup offers patients *a lifetime of experience* and knowledge in his state-of-the-art outpatient surgical center." (Italics added.) However, virtually all of Borup's "lifetime of experience" was in anesthesiology, not liposuction or surgery.

Regarding the use of the title, "director of surgery," Dr. Sundine opined that Davis violated the applicable standard of care by using that title. Sundine had never heard of a physician assistant identifying himself or herself as director of surgery or chief of surgery "at any of the hospitals that I've been at." Sundine testified that a director of surgery should be, at the least, a medical doctor. Sundine testified that he believed it was misleading for a physician assistant to identify as a director of surgery because "it tries to bestow credentials that I don't think they will have." Although Davis's expert, Dubrow, testified he knew of situations where non-physicians had the title director of surgery, he did not testify that any had been physician assistants or advertised their title for purposes of marketing their practices. And Dubrow acknowledged that the title could be misleading.

Sundine testified that Davis also violated the applicable standard of care in his use of the informed consent forms. Informed consent forms used by Pacific Liposculpture included the following authorization: "I hereby authorize Dr. Jerrell Borup, MD, Rod Davis, PA, and such assistants as may be selected to perform the procedure or treatment." This statement reads as if Dr. Borup *and* Davis, and possibly selected assistants, would perform the patient's liposuction procedure. A later version stated: "I hereby authorize Dr. Jerrell Borup, MD, OR Rod Davis, PA and such qualified assistants as may be selected to perform the procedure or treatment." Sundine testified that, on the forms, "there's this kind of hint that Dr. Borup . . . really is the person who's doing it or supervising it or is directly there. I think it's very misleading." The evidence established, and Davis acknowledged, that Davis had no intention of Borup performing any procedures, and thus any indication that Borup was or might be the one performing any given procedure or that he might be performing the procedure with Davis was disingenuous and misleading.

Asked whether any particular representations on the website were relevant in making her decision to submit to treatment at Pacific Liposculpture, C.N. identified the

language indicating that Dr. Borup "had 20 years' experience," which indicated to her that "he had, you know, lot of years of experience and that he was chief of staff formerly." The website left C.N. with the impression that Dr. Borup was knowledgeable in performing liposculpture.

K.D. testified that nothing about the website suggested to her that anyone other than a doctor would perform her liposculpture procedure.

L.W. assumed that a "director of surgery" would be a doctor.

S.M. testified that she found Davis's title—"director of surgery"—to be "extremely misleading." S.M. did not realize that, in California, someone could have that title when the person is not a surgeon.

Based on all of the foregoing, we conclude that substantial evidence supports the conclusion that these statements and representations constituted "misrepresentation[s] of fact," were "likely to mislead or deceive because of a failure to disclose material facts," contained "other representations or implications that in reasonable probability will cause an ordinarily prudent person to misunderstand or be deceived," and/or included "any statement, endorsement, or testimonial that is likely to mislead or deceive because of a failure to disclose material facts." (§ 651, subd. (b) (1),(2),(3)(A),(5),(8); see also § 17500.)

We are unpersuaded by Davis's contention that the advertising was "substantially accurate and was created without intent to mislead the public." First, Davis has not identified any "substantial accuracy" defense to a false advertising allegation where numerous statements are indeed false and misleading. Nor are we aware of any such defense. Second, even if intent is a required element, substantial evidence supports a finding of such intent. The statements were clearly and obviously false and/or misleading. Davis had control of the website and informed consent forms, he knew the true circumstances of the practice, and from the totality of the circumstances, it can be readily inferred that he intentionally made the statements false and misleading. Davis

58

knew Borup would not perform liposuction procedures and nonetheless created advertising and informed consent forms that strongly suggested Borup's active involvement in the procedures and that Borup had significant expertise in liposuction. Moscoso testified that Davis wanted to "downplay[]" the fact that Borup was not a plastic surgeon. The frequently asked questions script Davis gave to his employees further sheds light on Davis's intent. In response to the question who would perform the procedure, Davis instructed employees to answer: "Rod Davis is our *Director of Surgery* and he performs all of our procedures. He is *nationally certified* and specializes in liposculpture. He has performed over 10,000 procedures, *more than most physicians*. … Rod *is licensed in both California and New York*." (Bold omitted, italics added.) Davis did not tell his employees to explain he is a certified physician assistant or that the California and New York licenses referred to were for a physician assistant. And, in our view, the reference to "more than most physicians," in context was likely to be understood that Davis was a doctor who had done more liposculpture than other doctors.

Davis's contention he "never represented" that he was a physician also misses the mark. While there is no evidence in the record establishing that Davis affirmatively misrepresented that he was a physician, the evidence summarized *ante* demonstrates that Davis made misleading statements, particularly his title of "Director of Surgery," that would lead a reasonably prudent person to *believe* he was a physician and surgeon. We disagree with Davis's contention to the contrary that this title did not imply that he was a physician. Moreover, that there is evidence establishing he occasionally corrected people when they addressed him as "doctor" does not undermine our conclusion concerning the allegation of false and/or misleading advertising. And while he used the term P.A. in the website, he never spelled out what that meant, explained his certifications, or otherwise explained his formal training.

We conclude that substantial evidence supports the ALJ's conclusion that Davis disseminated false and misleading advertising.

## VI.  Repeated Acts of Negligence

### A.  Additional Background

The ALJ concluded:  Davis "engaged in repeated negligent acts in his care and treatment of LW, CN, KD and SM.  [Davis] used consent forms for each patient that were misleading and did not adequately inform the patients who would be performing their surgeries.  [Davis's] false and misleading advertisement and the confusing use of the title Director of Surgery caused patients to reasonably believe a medical doctor would have some involvement in their procedures.  Each of these constituted departures from the standard of care.  In addition, [Davis's] post-operative care of SM constitutes additional repeated negligence.  Clear and convincing evidence established that [Davis] engaged in repeated negligent acts."

### B.  Davis's Contentions

Davis asserts that substantial evidence does not support the ALJ's finding that he engaged in repeated acts of negligence.  He asserts the findings that the informed consent forms were misleading and his allegedly misleading use of the title "Director of Surgery" do not constitute negligent care and treatment.  He maintains the language of the informed consent forms was not misleading.  According to Davis, S.M. was the only patient whose actual treatment was found to have fallen below the standard of care.  Thus, Davis asserts that there was no evidence of negligent care of anyone other than S.M., and thus there was no repeated negligence to support the ALJ's findings.

### C.  Analysis

Section 2234, subdivision (c) identifies as unprofessional conduct "repeated acts of negligence."  To constitute repeated acts of negligence, "there must be *two or more* negligent acts or omissions.  An initial negligent act or omission followed by a separate

60

and distinct departure from the applicable standard of care shall constitute repeated negligent acts." (§ 2234, subd. (c), italics added.)[28]

We concluded in part IV. of the Discussion, *ante*, that Davis committed gross negligence in his post-operative care of S.M. Thus, only one additional act of negligence is required to support a finding of repeated acts of negligence.

As discussed in part V. of the Discussion, *ante*, substantial evidence supports the ALJ's conclusion that Davis's informed consent forms were misleading with regard to who would perform the liposuction procedures. As Davis acknowledges, C.N., K.D., and L.W., signed the earlier version, while S.M. signed the later version. The earlier version signed by the other three patients stated: "I hereby authorize Dr. Jerrell Borup, MD, Rod Davis, PA, and such assistants as may be selected to perform the procedure or treatment." As we have noted, this form misleads the patient to believe that Dr. Borup *and* Davis, and possibly selected assistants, would participate in the liposuction procedure. Dr. Sundine, testified that "there's this kind of hint that Dr. Borup . . . really is the person who's doing it or supervising it or is directly there. I think it's very misleading." Sundine testified that Davis violated the applicable standard of care regarding informed consent in his use of these informed consent forms. We agree.

---

[28] Section 2234 provides in pertinent part: "The board shall take action against any licensee who is charged with unprofessional conduct. In addition to other provisions of this article, unprofessional conduct includes, but is not limited to, the following: [¶] . . . [¶] (c) Repeated negligent acts. To be repeated, there must be two or more negligent acts or omissions. An initial negligent act or omission followed by a separate and distinct departure from the applicable standard of care shall constitute repeated negligent acts. [¶] (1) An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act. [¶] (2) When the standard of care requires a change in the diagnosis, act, or omission that constitutes the negligent act described in paragraph (1), including, but not limited to, a reevaluation of the diagnosis or a change in treatment, and the licensee's conduct departs from the applicable standard of care, each departure constitutes a separate and distinct breach of the standard of care."

61

The manifest purpose of the informed consent forms is to obtain the patient's informed consent. Failure to obtain informed consent is a form of professional negligence. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 240-241 (*Cobbs*); *Borman v Brown* (2021) 59 Cal.App.5th 1048, 1050, fn. 3; *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 322, citing *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 129 (*Moore*).) The foundation for a physician's duty to obtain informed consent rests on four postulates: "The first is that patients are generally persons unlearned in the medical sciences and therefore, except in rare cases, courts may safely assume the knowledge of patient and physician are not in parity. The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment. The third is that the patient's consent to treatment, to be effective, must be an informed consent. And the fourth is that the patient, being unlearned in medical sciences, has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions." (*Cobbs*, at p. 242.)

"It is the physician's duty ' "to disclose to the patient all material information to enable the patient to make an informed decision regarding the proposed *operation* or *treatment*. [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended *medical procedure*. ..." ' " (*Quintanillo v. Dunkelman* (2005) 133 Cal.App.4th 95, 115, quoting *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1188, fn. 9.)

We note here that section 2234, subdivision (c), does not limit repeated "acts" of negligence to the actual diagnosis or treatment of patients and does not require injury or harm. (See *Kearl, supra*, 189 Cal.App.3d at p. 1053 [section 2234 does not limit gross negligence or unprofessional conduct to the actual treatment of a patient; nor does it

require injury or harm to the patient before action may be taken against the physician or surgeon].) Moreover, our high court has recognized that informed consent is not necessarily limited to disclosing the risks of and alternatives to medical procedures.

In *Moore, supra,* 51 Cal.3d 120, the court addressed the question of whether a physician's failure to disclose preexisting research and economic interests related to a medical procedure performed on the plaintiff stated a cause of action for negligence based on an informed consent theory. (*Id*. at pp.124-125.) There, a doctor recommended removal of the plaintiff's spleen. (*Id*. at p. 126.) Before the operation, the doctor formed the intent and made arrangements to obtain portions of the spleen for medical research of plaintiff's blood cells unrelated to plaintiff's care. (*Ibid*.) Plaintiff was not informed of the plan to conduct this research nor was his permission requested. (*Ibid*.) Subsequently, at the doctor's direction, the plaintiff made additional visits to the doctor's office where samples of the plaintiff's blood were drawn and used for this research. (*Ibid*.) Our high court held that the doctor's failure to disclose his research and economic interests before obtaining plaintiff's consent for the medical procedures stated a cause of action that could "properly be characterized either as the breach of a fiduciary duty to disclose facts material to the patient's consent *or, alternatively, as the performance of medical procedures without first having obtained the patient's informed consent*." (*Id*. at p. 129, italics added.)

Citing *Cobb*, the *Moore* court stated that for a patient's consent to treatment to be effective, it must be informed consent and "in soliciting the patient's consent, a physician has a fiduciary duty to disclose all information material to the patient's decision." (*Moore*, *supra*, 51 Cal.3d at p. 129, citing *Cobbs*, *supra*, 8 Cal.3d at pp. 242, 246.) The court reasoned: "To be sure, questions about the validity of a patient's consent to a procedure typically arise when the patient alleges that the physician failed to disclose medical risks, as in malpractice cases, and not when the patient alleges that the physician had a personal interest, as in this case. *The concept of informed consent*, however, *is*

63

*broad enough* to encompass the latter. 'The scope of the physician's communication to the patient ... must be measured by the patient's need, and that need is whatever information is material to the decision.' " (*Id*. at p. 129, italics added.)

We see the concept of informed consent as being *broad enough* to include information about whether the person who is going to perform a patient's surgery is a doctor or not. Clearly identifying the practitioner who would perform surgery, making clear whether the person performing the procedure is a physician assistant and not a doctor, and making clear whether or not a physician would be involved at all are matters relevant to informed consent. Such information "is something that a reasonable patient would want to know in deciding whether to consent to a proposed course of treatment. It is material to the patient's decision and, thus, a prerequisite to informed consent." (*Moore, supra*, 51 Cal.3d at p. 130, citing *Cobbs*, *supra*, 8 Cal.3d at p. 245.) The failure to adequately make these disclosures here cannot be characterized as "a mere technical lapse such as 'failing to dot or cross all the "i's" or "t's".' " (*Kearl, supra*, 189 Cal.App.3d at p. 1054.)

At oral argument, counsel for Davis asserted that the patients knew Davis was not a doctor before their surgery. To the contrary, the evidence establishes that at least one of the patients who received the original consent form did not know that. Moreover, that patient and another who received the same form were never told the person who would be performing their surgery was not a doctor.

K.D. testified that when Davis introduced himself, he did not state what his title was and K.D. believed he was a doctor. When she went back for her second surgery the following day, she still had no reason to believe that he was not a doctor. When asked whether she knew Davis was supposed to be supervised by a doctor, K.D. testified she thought Davis was "the doctor." She testified she "absolutely" would not have gone through with either procedure had she known Davis was not a doctor for the following reason: "Because he's not a doctor and he's not a surgeon."

64

As for C.N., she testified that she knew Davis was a "PA or physician assistant," before her surgery. But this did not concern her because she thought the "guy that had 20 years of training was going to be the one doing [her] surgery," and she thought Davis would be "assisting in the procedure or at least overlooked by Dr. Borup." This belief was reasonable given the wording of the original consent form, which suggested Borup *and* Davis, and possibly selected assistants, would participate in the patient's procedure. C.N. testified that by the time she realized the doctor was not going to attend, she "was already getting cut open in the surgery room."

We conclude that the foregoing constitutes substantial evidence supporting the ALJ's and the Board's findings of repeated acts of negligence.[29]

## VII. Dishonesty and Unprofessional Conduct

### A. Additional Background

The ALJ stated: "[c]lear and convincing evidence established that [Davis] was dishonest by his false and misleading advertising." The ALJ further stated: "Pursuant to the findings of facts and discussions above, [Davis] engaged in acts that constituted engaging in the [un]lawful practice of medicine, gross negligence, repeated negligent

---

[29] On appeal, the Board also asserts that the determination as to repeated acts of negligence is supported by substantial evidence in that "it would be a violation of the standard of care if any patient was not given sufficient time to review the informed consent form and/or if [Davis] never discussed the risks associated with liposuction, which was established by substantial evidence." While we would conclude that substantial evidence in the form of Sundine's testimony as well as that of the patients would support this conclusion, neither the ALJ nor the Board relied on these grounds in the findings as to repeated acts of negligence, so we do not base our conclusions on either the time provided for review or the failure to discuss the risks. Also, we find it unnecessary to address whether the use of the title "director of surgery" in the context of the facts here was an act of negligence. We limit our consideration regarding repeated acts of negligence to those findings made by the ALJ and adopted by the Board related to the grossly negligent treatment of S.M. and the failure of the informed consent forms to disclose whether the person who would perform the surgery was a doctor.

65

acts, and disseminating false and misleading advertising. Clear and convincing evidence established that [Davis] engaged in unprofessional conduct that is unbecoming a member in good standing in the medical profession, breached the rules and ethical codes of a physician assistant, and demonstrates an unfitness to practice as a physician assistant."

## B. Davis's Contentions

Davis asserts that the Board erred as a matter of law in finding that he engaged in dishonesty and general unprofessional conduct. He asserts these findings were based on the allegations that he engaged in the unlicensed practice of medicine, committed gross negligence, committed repeated acts of negligence, and disseminated false and misleading advertising, which, he asserts as set forth *ante*, are not supported by substantial evidence. Davis asserts that there are no findings here to support a claim of " 'general unprofessional conduct.' " According to Davis, there "was no explanation in the Decision as to how any of [his] conduct amounted to general unprofessional conduct, or any analysis, other than the conclusory statement that it was based on 'the findings and discussions above.' "

## C. Analysis

### 1. Applicable Statutes and Case Law

Section 3527, which is part of the Physician Assistant Practice Act (§ 3500.5), provides, in pertinent part: "[t]he board may order the . . . suspension or revocation of, or the imposition of probationary conditions upon a PA license after a hearing as required in Section 3528 for unprofessional conduct that includes, but is not limited to, a violation of this chapter, a violation of the Medical Practice Act, or a violation of the regulations adopted by the board or the Medical Board of California." (§ 3527, subd. (a).)

Section 2234, which addresses unprofessional conduct, is also part of the Medical Practice Act (§ 2000), referred to in section 3527, subdivision (a). Among other things, section 2234 states that unprofessional conduct includes: "[v]iolating or attempting to violate, directly or indirectly, assisting in or abetting the violation of, or conspiring to

66

violate any provision of this chapter," gross negligence, repeated negligent acts, and the "commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon." (§ 2234, subds. (a)-(c), (e).)

"Unprofessional conduct is that conduct which breaches the rules or ethical code of a profession, or conduct which is unbecoming a member in good standing of a profession." (*Shea v. Board of Medical Examiners* (1978) 81 Cal.App.3d 564, 575, fn. omitted (*Shea*).)

## 2. Dishonesty

The governing board "may conclude that intentional dishonesty, even toward persons outside the practice of medicine, relates to the qualifications for practicing medicine and can be the basis for imposing discipline. [Citations.] As stated in [*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757], although a 'physician who commits income tax fraud, solicits the subornation of perjury, or files false, fraudulent insurance claims has not practiced medicine incompetently[,] that physician has shown dishonesty, poor character, a lack of integrity, and an inability or unwillingness to follow the law, and thereby has demonstrated professional unfitness meriting license discipline.' " (*Pirouzian v. Superior Court* (2016) 1 Cal.App.5th 438, 447-448 (*Pirouzian*).)

In part V.C. of the Discussion, *ante*, we concluded that substantial evidence supported the finding that Davis disseminated false and misleading advertising. For the same reasons, we conclude that substantial evidence supports a finding that Davis committed unprofessional conduct in the form of dishonesty. Furthermore, this dishonesty, in the form of intentionally false and misleading advertising soliciting business for the practice, was substantially related to the qualifications, functions, or duties of a physician, Borup, and a physician assistant, Davis. They were indeed more closely related than, for example, committing tax fraud, soliciting subornation of perjury, and filing false, fraudulent insurance claims as in *Pirouzian, supra,* 1 Cal.App.5th 438.

67

The ALJ's determination that Davis "was dishonest by his false and misleading advertising" is supported by substantial evidence, and, contrary to Davis's contention, the Board did not err as a matter of law in determining that he engaged in dishonesty.

### 3. Other Unprofessional Conduct

As stated *ante*, unprofessional conduct which may give rise to Board action including license revocation includes "[v]iolating or attempting to violate, directly or indirectly, assisting in or abetting the violation of, or conspiring to violate any provision of this chapter," gross negligence, repeated negligent acts, and the "commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon." (§ 2234, subds. (a)-(c), (e).)

Section 2052, addressing the unlicensed practice of medicine, is a "provision of this chapter" within the meaning of section 2234, subdivision (a). We have found that substantial evidence supports the conclusion that Davis engaged in the unlicensed practice of medicine.

We have also concluded that substantial evidence supports the determinations that Davis committed gross negligence and that he committed repeated negligent acts. (§ 2234, subds. (b), (c).)

We also conclude that substantial evidence supports the conclusion that the manner in which Davis established Pacific Liposculpture to facilitate his autonomous performance of liposuction procedures and avoid any meaningful supervision by a physician was conduct that was unbecoming of a physician assistant in good standing. (*Shea, supra*, 81 Cal.App.3d at p. 575.)

### 4. Conclusion — Unprofessional Conduct

Substantial evidence supports the conclusion that Davis engaged in unprofessional conduct looking at any of the aforementioned items individually, and when looking at his conduct in the aggregate.

68

## VIII.  The Discipline Imposed — Revocation of Davis's License

## A.  Additional Background

In contemplating the appropriate measure of discipline, the ALJ stated that the absence of prior discipline is an important mitigating circumstance, particularly where the professional has practiced for a substantial period of time.  Additionally, a "professional's good faith is a matter to consider in determining whether discipline should be imposed for acts done through ignorance or mistake."  The ALJ continued:  "In this case, [Davis] has a history of discipline.  His license was issued on a probationary basis because he failed to disclose a criminal conviction for being a 'disorderly person' he received in 1992, when he was 18 years old.  The prior discipline of [Davis's] license was based on conduct that was remote in time, and does not require enhanced discipline here.  [¶] However, the allegations in this case, and the findings on those allegations, are extremely serious.  [Davis] does not have a medical degree, yet he believed himself to be more experienced, trained, and skilled than a medical doctor.  Although [Davis] may be skilled at performing liposuction surgeries, he is not a physician.  [Davis] does not have the breadth of experience and knowledge gained by going through medical school courses, and successfully completing an internship and residency.  [Davis] (and the public) were fortunate that [he] was not faced with a life threatening medical complication that could have presented during the procedures.  [¶]  Perhaps more disturbing, and certainly reflective of [Davis's] character and judgment, was his conduct in establishing Pacific Liposculpture with the clear intent to practice medicine without competent supervision. He obtained the services of a physician who had absolutely no experience in liposuctions, who agreed not to perform any liposuctions, and who was content to stop by occasionally to look at some records and pick up a check.  And there is a serious question as to whether Dr. Borup was competent to evaluate the standard of care represented by those records.  [¶]  Although [Davis] sought a physician with little or no experience, he disseminated, or caused to be disseminated, advertisements that misrepresented and

69

exaggerated Dr. Borup's credentials and the make-up of the Pacific Liposculpture's professional 'team.' At the time he was touting Pacific Liposculpture's vast experience, training and knowledge, he had only been licensed as a physician assistant in California for three years. [Davis] testified he tried to change and/or remove any potentially misleading information and he stated he no longer uses the title Director of Surgery. However, his testimony lacked a sincere demonstration of admission of error, remorse or contrition; instead he testified he took these actions because he thought the board wanted him to, and to avoid the strict scrutiny of the board. [¶] It was suggested that [Davis] is currently working for a board certified plastic surgeon, and is now properly supervised. However, that physician did not appear at the hearing and no evidence was presented about the terms and conditions of [Davis's] current employment. [¶] . . . The board's highest priority in exercising its licensing, regulatory, and disciplinary functions is protection of the public. 'Whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount. [Citation.] Under the totality of the circumstances presented, the public would not be protected if [Davis] were to retain his license. Careful thought and deliberation was given to alternate disciplinary measures; however, the cumulative nature of [Davis's] conduct, his intentional scheme to circumvent the rules and regulations governing physician assistants, and consideration of the overriding concern for public safety require this result. Revocation is the only appropriate measure of discipline that will protect the public."

## B. Davis's Contentions

Davis asserts that the Board committed a manifest abuse of discretion in revoking his license. He argues there is no evidence that he lacks competence as a physician assistant or that any liposuction procedures were improperly performed. He contends that the revocation of his license was "a shocking, draconian result, apparently only for punitive purposes, and without reasonable support." He maintains that, with proper

70

supervision, he poses no danger to the public. He further asserts that most of the Board's accusations were found unsupported by the evidence. And he asserts that revocation is improper because he acted in good faith.

## C.  Standard of Review — Discipline Imposed

" 'The propriety of a sanction imposed by an administrative agency is a matter resting in the sound discretion of that agency, and that decision will not be overturned absent an abuse of discretion. [Citations.]' [Citations.] As to issues reviewed in the superior court under an abuse of discretion standard, 'the appellate court reviews the administrative determination, not that of the superior court, by the same standard as was appropriate in the superior court. [Citations.]' [Citation.] [¶] Thus, when reviewing an issue regarding the level of discipline imposed, 'the standard of review on appeal remains the same as it was in the superior court:  the administrative agency's exercise of discretion as to the discipline to be imposed will not be disturbed unless a manifest abuse of discretion is shown. [Citation.]' [Citation.] ' "Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed." [Citations.]' [Citation.] 'This rule is based on the rationale that "the courts should pay great deference to the expertise of the administrative agency in determining the appropriate penalty to be imposed." [Citation.]' [Citation.] [¶] ' "One of the tests suggested for determining whether the administrative body acted within the area of its discretion is whether reasonable minds may differ as to the propriety of the penalty imposed. The fact that reasonable minds may differ will fortify the conclusion that there was no abuse of discretion." ' " (*Hanna v. Dental Bd. of California* (2012) 212 Cal.App.4th 759, 764, quoting *Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692 & *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 501.) "[T]he agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506,

71

515 (*Topanga*).) "As stated by the United States Supreme Court, the 'accepted ideal . . . is that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." ' " (*Id.* at p. 516.)

## D. Analysis

We cannot conclude that the Board's determination was a manifest abuse of discretion. We have concluded that substantial evidence supports the findings that Davis engaged in the unlicensed practice of medicine, committed gross negligence in his post-operative care of S.M., committed repeated negligent acts, disseminated false and misleading advertising, and engaged in unprofessional conduct. These acts were not isolated or unrelated. Instead, most of them, with the exception of the post-operative care of S.M., were part of a scheme launched and carried out by Davis to establish a liposuction practice in which he would perform liposuction procedures autonomously, without meaningful or competent supervision. He sought out and found a physician who had no real experience in liposuction, or surgery, and who agreed not to perform procedures at the practice. He gave himself the title Director of Surgery, which we have determined is misleading to consumers who, under the circumstances presented here, could expect someone bearing that title to be a physician and surgeon. He disseminated false and misleading advertising, strongly suggesting that Pacific Liposculpture had various attributes it did not, including a physician performing the procedures along with a "team of highly trained liposuctionists."

As emphasized by the ALJ, protection of the public by statute is the highest priority for the Board and "[w]henever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount." (§ 3504.1.) We conclude that the Board did not commit a manifest abuse of discretion in adopting the ALJ's determination that, "[u]nder the totality of the circumstances presented, the public would not be protected if [Davis] were to retain his license.

72

. . .[T]he cumulative nature of [Davis's] conduct, his intentional scheme to circumvent the rules and regulations governing physician assistants, and consideration of the overriding concern for public safety require this result. Revocation is the only appropriate measure of discipline that will protect the public."

Davis asserts that the ALJ failed to adequately consider mitigating factors. He emphasizes: (1) the prior disciplinary investigation which was closed without any adverse findings, (2) that Dr. Borup was "approved" as his supervising physician by Davis's probation monitor, (3) that, following Borup's departure, he was properly supervised by a highly qualified physician up to the time of the hearing, and (4) that he made other changes responsive to the Board's desires.

The ALJ considered the remedial steps Davis took. However, the ALJ was not persuaded of the mitigating value of these steps, finding that Davis had not genuinely acknowledged the error of his ways, and was not remorseful or contrite. The ALJ also considered the issue that Davis was, at the time of the hearing, working under the supervision of a board certified plastic surgeon and was purportedly properly supervised, although the ALJ stated that the physician did not testify, and "no evidence was presented about the terms and conditions of [Davis's] current employment."[30] Furthermore, we are

---

[30] Davis asserts that the ALJ "cut off testimony regarding [Davis's] employment and supervision by Dr. Robbins as having limited value." When Davis's attorney began to question Davis about the background of his current supervising physician, Dr. Robbins, the Board's attorney objected based on relevance. Davis's attorney stated, "I suppose it goes to issues of potential need for discipline. Some people call it mitigation. I don't know what you call it, but I think what's going on now is important for the Court in hearing the case." On the page cited by Davis, the ALJ allowed limited inquiry into the matter, but stated that it did not require anything extensive. Davis's attorney then elicited testimony from Davis concerning Robbins's background. However, after very limited testimony on the matter, Davis's attorney, not in response to any prohibition by the ALJ, abruptly pivoted to other areas of inquiry.

not persuaded of the mitigating value of the circumstance that a prior investigation into the unlicensed practice of medicine involving Davis and Dr. Borup did not result in any adverse findings. This is particularly true since the scope of that prior review is not established in the record here. Nor are we persuaded by the prior approval of Dr. Borup by Rodriguez as Davis's supervisor because the evidence is not clear what Rodriguez was told. Moreover, these matters mostly pre-date the events at issue here, and they do not serve to mitigate the unprofessional conduct found by the ALJ. The ALJ acknowledged the prior investigation, as well as the fact that Davis was working under the supervision of Dr. Robbins, in her recitation of the hearing evidence. We do not agree with Davis's contention that the ALJ improperly failed to take mitigating factors into account.

Davis relies on *Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, in asserting that revocation of a license is improper where the practitioner acted in good faith. However, the ALJ did not conclude that Davis acted in good faith. Thus, *Magit*, in which the trial court found, on sufficient evidence, that the practitioner "acted in the utmost good faith" (*id*. at p. 88), is not helpful to Davis here.

Davis also relies on *Pirouzian, supra*, 1 Cal.App.5th 438. In that case, the physician did "not dispute the ALJ's findings that he committed numerous acts of dishonesty . . . with respect to his employment status and disability insurance benefits." (*Id*. at p. 447.) The *Pirouzian* court determined that revocation of the physician's license

---

The Board filed a motion to strike footnote 8 from Davis's opening brief, which addressed Robbins's work at the practice, because it was based on evidence outside the administrative record. Decision on the motion was deferred pending the calendaring and assignment of the appeal. The representations in footnote 8 are not necessary to any of our determinations here, and we need not consider them. Thus, we need not grant the motion to strike, as we simply disregard information not part of the administrative record that is not necessary to our determinations. (Cf. *City of Arcadia v. State Water Resources Control Bd.* (2010) 191 Cal.App.4th 156, 180 [court need not grant motion to strike portions of plaintiffs' brief on the ground that they constitute improper surreply where court can simply disregard the offending contentions].)

74

was not necessary to protect the public. (*Id.* at p. 448.) Among other things, the court noted, "Dr. Pirouzian's dishonest acts, while serious, were focused on his efforts to obtain disability insurance benefits and preserve the possibility of returning to work . . . . Significantly, there is no evidence that his dishonesty involved or affected the treatment or care of any patient, or the billing of clients." (*Id.* at p. 449.) Here, Davis's acts directly related to the treatment and care of patients. The *Pirouzian* court further stated: "Dr. Pirouzian's acts of dishonesty took place over a discrete period of several months in 2007, during a period of time when he was diagnosed with depression. Prior to and since that time, there was and has been nothing (so far as the record discloses) to indicate that Dr. Pirouzian behaved unprofessionally in any way. Indeed, his record is otherwise unblemished." (*Ibid.*) Here, Davis's acts did not occur over such a brief period of time.

Davis relies on *Topanga, supra*, 11 Cal.3d 506, in asserting that there must be established a link between the "act and fitness or competence of the health care professional and the proposed disciplinary order the Board would impose." As indicated *ante*, there is such a link here. Here, the Board's decision was sufficient to "bridge the analytic gap between the raw evidence and ultimate decision or order," as it adopted the findings and legal conclusions made by the ALJ, which thoroughly described the evidence and the violations, and the rationale for the measure of discipline. (*Id.* at p. 515.)

We conclude that the Board did not commit a manifest abuse of discretion in choosing to revoke Davis's license.

## DISPOSITION

The judgment is affirmed.  The Board shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

_____/s/_____

MURRAY, J.

We concur:


_____/s/_____

RAYE, P. J.


_____/s/_____

DUARTE, J.